ANDERSON & KARRENBERG, PC
THOMAS R. KARRENBERG (#3726)
JON V. HARPER (#1378)
700 Bank One Tower
50 West Broadway
Salt Lake City, UT  84101
Telephone: 801/534-1700
801/364-7697 (fax)

LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
MARY K. BLASY
401 B Street, Suite 1600
San Diego, CA  92101-4297
Telephone: 619/231-1058
619/231-7423 (fax)

LAW OFFICES OF ALFRED G.
   YATES, JR., P.C.
ALFRED G. YATES
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA  15219
Telephone: 412/391-5164
412/471-1033 (fax)

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ELLIOT FIRESTONE, On Behalf of Himself and All Others Similarly Situated,   )<br>  )<br>                      Plaintiff,   )<br>  )<br>        vs.   )<br>  )<br>IMERGENT, INC., BRANDON B. LEWIS, ROBERT M. LEWIS, DONALD L. DANKS, DAVID L. ROSENVALL, DAVID T. WISE, PETER FREDERICKS and THOMAS SCHEINER,   )<br>  )<br>  )<br>  )<br>                  Defendants.   )<br>  ) | No. <br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>Judge Dee Benson<br>DECK TYPE: Civil<br>DATE STAMP: 03/08/2005 @ 16:07:14<br>CASE NUMBER: 2:05CV00204 DB<br><br><br>DEMAND FOR JURY TRIAL |

## SUMMARY AND OVERVIEW

1.      This is a securities class action on behalf of all purchasers of the publicly traded securities of iMergent, Inc. ("iMergent" or the "Company") between November 30, 2004 and February 25, 2005 (the "Class Period"), against iMergent and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.      iMergent sells Internet merchant services through its StoresOnline, Inc. subsidiary. Through its subsidiary, iMergent mass markets storefront software and service packages through marketing seminars to small businesses to facilitate their online sales.  A significant portion of iMergent's sales are made through installment contracts through which customers make 10% down payments, promising to pay the balance of the average $5,000 purchase price in installment payments.

3.      Throughout the Class Period, iMergent represented to the investment community that it was a successful software company while concealing that its sales practices violated the laws of many of the states it operates in and the full extent of the uncollectibility of its installment contracts with its clients, many of which did not meet the Company's own credit criteria.  On February 22, 2005, it was disclosed that the Texas Attorney General had filed suit against iMergent, the Company's Chairman, Donald L. Danks ("Danks"), and the Company's President, Brandon B. Lewis ("Brandon Lewis"), alleging the Company's wholly owned subsidiary, StoresOnline.com (formerly known as Gallaxy Mall Inc.), was selling defective storefront software and service packages and extorting thousands of dollars in additional "executive mentoring" fees from its customers when they could not use the software packages.

4.      But even more unsettling to investors were Danks' admissions at an investment conference held on February 25, 2005, that iMergent had been selling the software packages in

- 1 -

installment contracts to customers with subprime credit.  Many of these customers had little or no success with the Company's software and simply walked away from their contractual obligations when their new online "businesses" failed.  Danks admitted that in the aggregate, only approximately 56% of the purchase price was eventually collected from these subprime customers through installment contracts.

5.      As a result of defendants' false statements, iMergent's stock price traded at inflated levels during the Class Period, increasing to above $25 per share on February 9, 2005, at which time the Company's top officers and directors sold or otherwise disposed of more than $6.5 million worth of their own shares.  As the market digested this news, the Company's stock price plummeted from its Class Period high of over $25 per share on February 9, 2005 to below $12 per share on March 1, 2005, when trading was halted.

6.      The true facts, which were known by each of the defendants but concealed from the investing public during the Class Period, were as follows:

(a)      The Company's storefront software was defective;

(b)      iMergent was extorting from its customers thousands of dollars in additional fees for technical support, characterized as "executive mentoring," above and beyond what customers contracted to pay as part of their service packages when they purchased the storefront software;

(c)      Since at least 2000, numerous customers had lodged complaints with various state agencies concerning defects with the storefront software and the exorbitant "executive mentoring" fees charged;

(d)      The Company's storefront software and service packages were being illegally marketed as "franchises" or "business opportunities" because iMergent was not registering to do this

- 2 -

type of business in the states it was operating in and was not following the statutes applicable to companies that market franchises and business opportunities in those states;

        (e)      The Company was extending credit to customers with subprime credit without disclosing that the Company did not require these customers to meet the Company's credit criteria;

        (f)      The Company was entering into installment contract sales on defective storefront software packages, knowing the defects in the software, difficulty of use and refusal of some customers to purchase the so-called "executive mentoring" needed to operate the software would lead to higher customer dissatisfaction, product rejections, refusal to pay for product packages being financed by the Company and complaints to and legal action by federal and state authorities; and

        (g)      Defendants had concealed that iMergent had been subject to a lawsuit and cease and desist order by the State of Washington in early 2004 concerning misconduct similar to that alleged by the State of Texas in its February 2005 lawsuit.

## JURISDICTION AND VENUE

7.      Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

8.    (a)      Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.

        (b)      The Company's principal executive offices are located at 754 E. Technology Avenue, Orem, Utah 84097, where the day-to-day operations of the Company are directed and managed.

- 3 -

## THE PARTIES

9.       Plaintiff Elliot Firestone purchased iMergent publicly traded securities as described in the attached certification and was damaged thereby.

10.      Defendant iMergent is an e-services company headquartered in Orem, Utah.

11.      Defendant Brandon B. Lewis ("Brandon Lewis") is the President and a director of iMergent.  During the Class Period, Brandon Lewis sold or otherwise disposed of more than $2.7 million worth of his iMergent stock.

12.      Defendant Robert M. Lewis ("Robert Lewis") is the Chief Financial Officer of iMergent.  During the Class Period, Robert Lewis sold more than $598,000 worth of his iMergent stock.

13.      Defendant Donald L. Danks ("Danks") is Chairman of the Board, CEO and a director of iMergent.

14.      Defendant David L. Rosenvall ("Rosenvall") is the Chief Techology Officer and a director of iMergent.  During the Class Period, Rosenvall sold more than $1 million worth of his iMergent stock.

15.      Defendant David T. Wise ("Wise") was the Vice President of Operations of iMergent.  During the Class Period, Wise sold or otherwise disposed of $638,527 worth of his iMergent stock.

16.      Defendant Peter Fredericks ("Fredericks") was a director of iMergent.  During the Class Period, Fredericks sold or otherwise disposed of over $1.2 million worth of his iMergent stock.

17.      Defendant Thomas Scheiner ("Scheiner") was a director of iMergent.  During the Class Period, Scheiner sold $250,900 worth of his iMergent stock.

18.      The individuals named as defendants in ¶¶11-17 are referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company,

possessed the power and authority to control the contents of iMergent's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein at ¶¶28, 31 and 34, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

### SCIENTER

19.    In addition to the above-described involvement, each Individual Defendant had knowledge of iMergent's problems and was motivated to conceal such problems. Robert Lewis, as CFO, was responsible for financial reporting and communications with the market. Many of the internal reports showing iMergent's forecasted and actual growth were prepared by the finance department under Robert Lewis' direction. Defendant Danks, as CEO and Chairman, and Brandon Lewis, as President, were responsible for the financial results and press releases issued by the Company. Each Individual Defendant sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market.

20.    Each of the defendants was motivated to engage in the fraudulent practices alleged herein in order to reap millions in illegal insider trading.

- 5 -

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

21.    Each defendant is liable for (i) making false statements, *or* (ii) failing to disclose adverse facts known to him about iMergent. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of iMergent publicly traded securities was a success, as it (i) deceived the investing public regarding iMergent's prospects and business; (ii) artificially inflated the prices of iMergent's publicly traded securities; (iii) allowed defendants to scheme to obtain larger bonuses which were directly tied to the performance of iMergent; (iv) allowed defendants to sell or otherwise dispose of in excess of $6.5 million worth of iMergent shares at artificially inflated prices; (v) allowed defendants to triple the size of the Company's line of credit; and (vi) caused plaintiff and other members of the Class to purchase iMergent publicly traded securities at inflated prices.

## BACKGROUND

22.    iMergent, through its wholly owned subsidiary, StoresOnline, Inc., sells software and service packages for starting and conducting business on the Internet. These software and service packages are sold with the representation that by using these software and services, the purchaser will be able to put up a storefront Web site on the Internet from which the purchaser/business operator will be able to sell his or her particular services or products. StoresOnline holds seminars in hotels around the nation soliciting individuals interested in starting a business on the Internet.

23.    Doing business as Gallaxy Mall Inc., the Company had been sued and investigated by Consumer Fraud divisions in many states and by the FTC. The Company had consistently denied wrongdoing. In January 2004, iMergent entered into a consent decree with the State of Washington Securities Division of Financial Institutions which had sued the Company for violating

- 6 -

Washington's Business Opportunity Fraud Act in order to lift a cease and desist order that had been entered against the Company for violations of that Act.

24.     The Texas Attorney General's complaint filed February 22, 2005 alleges that prior to selling these "business opportunities," StoresOnline did not provide any of the disclosures required by law regarding ownership, sales period, description of services, financial statements, training description, security description, delivery date, earnings representations, legal actions, bankruptcy information or a sample copy of the contract.  Moreover, according to the Texas Attorney General, StoresOnline falsely represented that by purchasing and using the Company's storefront software packages, customers' profits would greatly exceed the cost of the software.

25.     Several complaints filed with the Texas Attorney General's office indicated that deceptive and misleading representations were being made to consumers at the seminars to induce them to buy the Company's services and products, leaving customers believing that technical assistance was part of the package they were purchasing, when, in fact, this assistance would cost extra.  According to the Texas Attorney General, once customers bought these software packages, "they were left with worthless software" and "were asked to pay still more money for more assistance which was alleged to be of little or no value."

26.     On August 10, 2004, the Company issued a press release entitled "iMergent Announces Approval to Trade on American Stock Exchange," announcing that the Company and its stock had been approved to trade on the American Stock Exchange and would commence trading within a few days.

27.     On October 26, 2004, the Company issued a press release entitled "iMergent Reports Record First Quarter Revenue; First Quarter Revenue Grew 26%; Earnings Before Taxes Rose 30%;

- 7 -

EBT per Diluted Share Increased to $0.23; EPS of $0.14 per Diluted Share for First Quarter." The

press release stated in part:

> iMergent, Inc., a leading provider of eCommerce and software for small businesses and entrepreneurs, announced its results for the fiscal first quarter ended September 30, 2004.
>
> Total revenue for the fiscal first quarter 2005 ended September 30, 2004 rose 25.8 percent to *$23.7 million* from *$18.8 million* in the same quarter of 2004. In the first quarter of 2005, *the company hosted 169 workshops*, of which 29 were international, compared to the first quarter of 2004, *when the company conducted 118 workshops*, none of which were international.
>
> Brandon Lewis, president and chief operating officer, said, "iMergent continued to deliver strong growth this quarter both internationally and domestically. In order to support our rapid growth we accelerated expansion of our sales resources and product capabilities for all markets. Our fifth sales team has completed its extensive training and will be on the road next week. We have also built a flexible infrastructure to deploy additional sales teams when necessary to support our continued growth. We are particularly pleased that our growth in earnings exceeded our growth in sales even as we accelerated our investment in sales."

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

28.     On November 30, 2004, the beginning of the Class Period, the Company issued a

press release entitled "iMergent Announces Successful Results of United Kingdom Workshops;

13 Workshops Bring in $3.4 Million in Total Revenue." The press release stated in part:

> iMergent, Inc., a leading provider of eCommerce and software for small businesses and entrepreneurs, today announced its most recent results for the StoresOnline(TM) workshops held in the United Kingdom. iMergent held 13 workshops throughout the U.K., earning $3.1 million in revenue. In addition, the company recorded in excess of $300,000 in ancillary product revenue in the U.K. subsequent to the workshops.
>
> The workshops were held during October, and offered potential customers the StoresOnline platform for managing and promoting online businesses using StoresOnline eCommerce software.
>
> Don Danks, chairman and chief executive officer, stated, "As we discussed in our October conference call, we anticipated superb results from our workshops in the U.K. Delivering $3.1 million in revenue from these workshops, with strong follow on ancillary product sales, demonstrates that our international marketing strategy continues to gain momentum. We have successfully expanded the StoresOnline

platform to Australia, Canada, New Zealand and the U.K. We expect to build on this success as iMergent continues its aggressive advance into multiple international markets throughout fiscal 2005."

29.     Whereas the October 26, 2004 announcement of 1Q 05 financial results had shown revenues of approximately $140,000 per workshop ($23.7M/169 workshops), the November 30, 2004 report showed revenues of $262,000 per workshop ($3.4M/13 workshops) *or almost double the revenue!*  The market responded positively to the November 30, 2004 news, driving the Company's stock price up from its $12.20 close on Monday, November 29, 2004, to close at $13.63 on Friday, December 3, 2004, and the stock price continued to climb.

30.     Between December 3, 2004 and December 27, 2004, defendants Fredericks, Rosenvall, Brandon Lewis and Wise sold or disposed of over $227,000 worth of iMergent common stock at inflated prices:

| Defendant | Date | Number of Shares | Price | Total Proceeds |
|---|---|---|---|---|
| Wise | 12/3/04 | 2,900 | $13.63 | $39,527 |
| Brandon Lewis | 12/3/04 | 8,000 | $13.63 | $109,040 |
| Rosenvall | 12/14/04 | 3,335 | $15.00 | $50,025 |
| Fredericks | 12/27/04 | 2,000 | $14.50 | $29,000 |
| **Total** | | **16,235** | | **$227,592** |

31.     On January 27, 2005, the Company issued a press release entitled "iMergent Reports Record Second Quarter Revenue and Earnings." The press release stated in part:

iMergent, Inc., a leading provider of eCommerce and software for small businesses and entrepreneurs, announced its results for the fiscal second quarter and six-month ended December 31, 2004.

Total revenue for the fiscal second quarter 2005 ended December 31, 2004 rose 78 percent to $31.4 million from $17.7 million in the same quarter of fiscal 2004. During the quarter, the company hosted 177 workshops, of which 51 were international, compared to the second quarter of 2004 when the company conducted 116 workshops, 13 of which were international.

Brandon Lewis, president and chief operating officer, said "During the quarter, to offset what is typically a seasonally slow sales period, we implemented specific programs, in particular continuing to increase our marketing internationally.

- 9 -

As a result, sales execution across all geographic regions exceeded our expectations, and we experienced exceptionally strong results internationally. We held a record number of 177 workshops this quarter, including 32 workshops in the United Kingdom, Australia and New Zealand, where we are seeing outstanding growth and interest. In addition to the increased capacity from our fifth sales team launched in November, we drove incremental sales from existing customers with compelling ancillary products."

Lewis continued, "In October, we introduced The Power of eBay® workshops. By January, we were able to offer the eBay workshop as an additional service to all of our domestic workshops. Today, over 70 percent of our customers attend our eBay workshops. Similarly, we began offering the Links4Trade partnership option in November, and today over 90 percent of our customers utilize the Links4Trade feature. Both products are examples of leveraging our distribution channels to increase sales. We will continue to drive this process forward by developing and introducing new products and services strategically positioning our StoresOnline™ software platform in the evolving eCommerce market."

32.     On January 27, 2005, the *Associated Press* issued an article entitled "iMergent 2Q

Profit Doubles, Raises Views; iMergent Inc. Second Quarter Earnings Soar to Beat Consensus, Sees

Higher 2005 Revenue." The article stated in part:

iMergent Inc., a provider of e-commerce and software for small businesses and entrepreneurs, said its second-quarter earnings doubled, beating analysts' estimates. The company also increased its full-year outlook.

The company's shares rose $2.35, or 13.5 percent, to $19.80 in afternoon trading on the American Stock Exchange, passing the 52-week high of $18.49 reached on Jan. 25.

Net income rose to $3.05 billion, or 24 cents per share, from $1.5 billion, or 12 cents per share, a year ago. Earnings before income taxes rose to $4.9 million, or 39 cents per share. Revenue grew 78 percent to $31.4 million from $17.7 million.

Analysts surveyed by Thomson First Call predicted earnings of 14 cents on revenue of $23.5 million.

During the quarter, the company hosted 177 workshops, 51 of which were international, up from 116 workshops last year, when it gave 13 international courses.

"During the quarter, to offset what is typically a seasonally slow sales period, we implemented specific programs, in particular continuing to increase our marketing internationally," said Brandon Lewis, president and chief operating

officer. "As a result, sales execution across all geographic regions exceeded our expectations, and we experienced exceptionally strong results internationally."

Looking ahead, iMergent increased its expectations for 2005 revenue growth to 30 percent to 35 percent from a previous estimate of a 20 percent to 30 percent improvement. In 2004, the company posted revenue of $81 million. Analysts expect the company to post revenue of $102.6 million for 2005.

33.     Between January 31, 2005 and February 11, 2005, as iMergent's stock price climbed to its Class Period high of over $25 per share on this positive news and defendants' fraudulent non-disclosures of iMergent's illegal business practices, defendants once again sold or otherwise disposed of over $6.2 million worth of the Company's stock:

| Defendant | Date | Number of Shares | Price | Total Proceeds |
|-----------|------|------------------|-------|----------------|
| Wise | 2/9/05 | 25,000 | $23.96 | $599,000 |
| Brandon Lewis | 2/9/05 | 110,968 | $23.95 | $2,657,684 |
| Rosenvall | 2/9/05 - 2/10/05 | 40,000 | $23.83 - $24.74 | $971,400 |
| Fredericks | 1/31/05 - 2/9/05 | 55,000 | $20.70 - 23.78 | $1,218,000 |
| Robert Lewis | 2/9/05 | 25,000 | $23.92 | $598,000 |
| Scheiner | 2/11/05 | 10,000 | $25.09 | $250,900 |
| Total | | 265,968 | | $6,294,984 |

34.     On February 9, 2005, the Company issued a press release entitled "iMergent Announces Increased Line of Credit with JPMorgan Chase & Co.; Line of Credit Increases to $15 Million; Term Extended Three More Years." The Company had just arranged a $5 million credit line in August 2004. The press release stated in part:

iMergent, Inc., a leading provider of eCommerce and software for small businesses and entrepreneurs, announced a $10 million increase to its existing $5 million line of credit with JPMorgan Chase & Co. The agreement allows iMergent to borrow up to $15 million at the London interbank offered rate (LIBOR) plus 2 percent and extends its term three more years. The line of credit will provide accessible working capital to support the company's growth initiatives.

Rob Lewis, chief financial officer, stated, "The increase in the line of credit with JPMorgan Chase & Co. is a vote of confidence in iMergent's profitable business model. We have been successful in executing our global growth strategy and the increased credit line offers enhanced flexibility for us to fund our capital needs at attractive rates in support of that growth."

- 11 -

35.     On February 22, 2005, the Texas Attorney General issued a press release entitled

"Attorney General Abbott Files Three Actions In Support Of Operation Biz Opp Flop Sweep;

Federal authorities, several states crack down on work-at home scams, other frauds."  The press

release stated in part as follows:

> Texas Attorney General Greg Abbott today announced the filing of three legal
> actions in support of a nationwide roundup targeting the operators of fraudulent
> business opportunities and work-at-home schemes.
>
> The Texas actions are part of a nationwide enforcement sweep involving the
> Federal Trade Commission, the Department of Justice, the U.S. Postal Inspection
> Service and 14 states.
>
> Called Operation Biz Opp Flop, the coalition is charging more than 130
> fraudulent operations with violating various consumer protection laws, including
> cases in Texas that have resulted in a contempt filing against a wedding career
> consultant and a suit alleging misrepresentations by a company selling online
> business software and service packages.
>
> "Get-rich-quick schemes and false promises plague Texas consumers, and I
> am proud to participate in this wide-ranging effort to eradicate them," said Attorney
> General Abbott.  "I am determined to stop scam operators who ruthlessly exploit
> well-meaning consumers, and I will make every effort to get money back for those
> who were wronged."
>
> Attorney General Abbott filed a lawsuit today in Bexar County District Court
> against  Delaware  corporation  iMergent  Inc.,  which  does  business  as
> Storesonline.com, and sued its officers, Brandon Lewis and Donald Danks.
>
> Formerly known as Galaxy Mall Inc., Storesonline.com spokespersons claim
> in hotel seminars and training sessions held in cities across Texas that its software
> and services will enable a consumer to set up successful Web sites and sell various
> products or services at a large profit.  The company promises a profit return of far
> more than the initial $500 fee for the Web package, as well as support and
> mentoring.
>
> However, after interested consumers have set up the Web site, the defendants
> then approach them with an offer of "expert technical assistance," which costs an
> additional $4,000 or more. Consumers who complained to the Attorney General
> about Storesonline.com said they were led to believe the expert technical assistance
> was part of the $500 startup fee.
>
> Others complained the software they purchased was faulty or that consumers
> who visited their Web sites could not purchase the items, resulting in many lost sales.

- 12 -

The Attorney General will seek injunctions prohibiting this conduct as well as restitution to consumers, civil penalties and attorneys' fees.

36.     By mid-February, rumors relating to the Company's illegal acts in Texas began to seep into the market sending the shares into a free fall.

37.     Then, on February 25, 2005, the Company issued a press release, entitled "iMergent in Discussions with Texas Attorney General; Company Confident in Amicable Resolution," which was designed to diminish the materiality of the Texas issues.  The press release stated in part:

> iMergent, Inc., a leading provider of eCommerce and software for small businesses and entrepreneurs, announced it has reviewed the petition filed by the Attorney General of Texas and management categorically denies the alleged and unsubstantiated claims about iMergent's business practices.
>
> Jeffery Korn, general counsel of iMergent, stated, "On February 14th, immediately upon being notified by the Texas Attorney General who filed the petition, I contacted their office proactively initiating attempts to resolve this matter. I am continuing those discussions and I am quite confident we will resolve this issue amicably in the near term."
>
> Referring to the petition, Don Danks, chairman and chief executive officer, stated, "A few similar situations have occurred in the past, but because we fully comply with all applicable laws and statutes, all have been resolved amicably."

38.     On this news, the Company's shares continued their free fall.  Thus, in one week, the Company had lost more than half of its market share price and erased more than $100 million of market value.  As described at ¶¶30 and 33, the top officers of the Company did not fare as poorly as the shareholders.  In fact, defendants actually profited from their charade and illegal acts to the tune of $6.5 million dollars.

39.     The true facts, which were known by each of the defendants but concealed from the investing public during the Class Period, were as follows:

        (a)     The Company's storefront software was defective;

(b)     iMergent was extorting from its customers thousands of dollars in additional fees for technical support, characterized as "executive mentoring," above and beyond what customers contracted to pay as part of their service packages when they purchased the storefront software;

(c)     Since at least 2000, numerous customers had lodged complaints with various state agencies concerning defects with the storefront software and the exorbitant "executive mentoring" fees charged;

(d)     The Company's storefront software and service packages were being illegally marketed as "franchises" or "business opportunities" because iMergent was not registering to do this type of business in the states it was operating in and was not following the statutes applicable to companies that market franchises and business opportunities in those states;

(e)     The Company was extending credit to customers with subprime credit without disclosing that the Company did not require these customers to meet the Company's credit standards, and without disclosing that the financing of these customers was essentially a gamble because if they did not generate sufficient business off their Web sites, the loans would not be repaid and iMergent's purported revenue stream could simply vanish;

(f)     The Company was entering into installment contract sales of defective storefront software packages, knowing the defects in the software, difficulty of use and refusal of some customers to purchase the so-called "executive mentoring" needed to fix the software would lead to higher customer dissatisfaction, product rejections, refusal to pay for product packages being financed by the Company and complaints to and legal action by federal and state legal authorities; and

- 14 -

(g)     iMergent had been subject to a lawsuit and cease and desist order by the State

of Washington in 2003 which was secretly settled in early 2004, prior to the State of Texas bringing

suit for similar misconduct.

40.     Also on February 25, 2005, defendants held a press conference and for the first time

detailed the Company's reliance on risky installment contract financing provided to customers to

facilitate software package sales.

> [Danks:]  We have about 25 percent – we'll see about 210,000 people this year in those previews, about 25 percent of them, about 55,000 will attend one of 700 full-day training workshops.  These workshops are $20 just to basically keep people who want free meals out.  It's 10 to 12 hours of intensive and very good information, not on our software platform.

> We demonstrate our platform during this entire day in the training, but to kind of leverage the software, and when we – these 100 people or so who come to each of these workshops or 85 to 90, I should say, coming to these workshops, we're completely agnostic to their business, we don't know what their business is, we don't care what their business is.  We have a software platform, we show them how to leverage it, how to use it.  There are about 25 different units of instruction that we go through during the day.  Only after the end of that day of training do we make our software license offer.

> And we have – because we have a fixed cost model where we have done all this education upfront, our preview sessions, our workshops, by the time we're done with this we have sunk $45,000 or so into that marketing process to have 85 or 90 small businesses in a position to buy our license.  When we – we closed about 35 percent of the people who attend the full-day workshop.

> The average license now is about $5,000.  And just on a comparative price basis for that $5,000, you get 6 websites and if you compare that even to Yahoo stores it's not much more expensive, but it comes with an enormous amount of training, and greater customer service on the back end than any of the other competitors out there for small businesses.  45 percent of the people who buy that day pay credit cards or cash checks, we collect the money at that point.  55 percent finance.  About a third of them have credit scores of 630 or greater.  They're not a great credit risk.

> We take about $500 down, we finance the balance over 24 months, and we take a reserve of about 15 percent, even though we collect greater than the 15 percent over the life of those A credit contracts.  Because we have a fixed cost model all costs are sunk, it makes sense to then extend credit even to B credits, because the

marginal expense of taking that credit risk is about $15 in software and documentation, discs and documentation versus the $500 down payment we get.

But because I want our balance sheet to reflect accurately what we expect to collect in the future, I take a 50 percent reserve on that portfolio of B credit contracts even though we collect greater than that I over reserve, so when you see our balance sheet, it's conservative, we're not having to take write-downs in the future.  In fact, we will be able to add income as we collect more than we've reserved for.

We have 4 years of history and the collections on those B credits have been trending positively in the last couple of years, and we anticipate over time being able to bring that reserve down as we perform better, gaining greater scale, more credibility as a growing software and hosting company. *So if you look at that average B credit contract, we collect the $500 down and about 56 percent of the contract over the life, so for that $15 marginal expense, giving the software after our sales process is done, we collect nearly $3,000*, and it preserves the pricing for the A credits and the cash payers, which are now almost 63 percent, 64 percent of our clients overall so we preserve the pricing and our effort is solely on getting these B credits to -- not solely.

One of our primary efforts are getting these B credit folks to publish their websites, because once they publish, their credit risk goes way down.

41.     This precarious financing alarmed the market as the financial community learned of the full extent of previously concealed customer complaints, such as those lodged by the customers detailed in the Texas complaint accusing iMergent of "false, deceptive and misleading acts and practices."

42.     In fact, numerous complaints against iMergent, having been lodged as early as 2000, were detailed in the Texas complaint.  For instance, one customer stated that the software he received was faulty and could not be used.  He contacted StoresOnline's customer service department during which time he waited long periods of time on the telephone only to discover that the representatives could not answer his technical questions.  He also complained that the Company contacted him in order to offer one-to-one technical assistance, denominated as an "executive mentor," as a way to correct his problem and to increase his success rate.  The mentor, however, was to cost an extra $1,415.  He declined to purchase the mentor program.  He was led to believe that the

mentor program was part of the package he had purchased at the seminar and not an extra that would cost him more money. He indicated that the Company provided none of the services that they promised and that the Company tried to extract additional money from him by soliciting the sale of technical assistance that should have been provided from the start.

43.     Another customer said he purchased a Web site from StoresOnline from which he intended to advertise and sell his books and CD's. He stated that once his Web site was operational, people began to complain to him that they could not purchase the items that they wanted from his online store, indicating the software could not process the sales orders he was receiving and thus, he lost many sales. He says that his Web site had approximately 6,430 visitors but only 10 sales. This customer stated he contacted the Company many times to try to correct the problem but the only responses he received was that nothing was wrong.

44.     A third customer filed a complaint stating that she had attended a StoresOnline seminar during which she purchased Web site storefronts and other materials that she was told would help her in developing her online stores. She complained that she was promised expert advice on programming and promoting her Web site. She stated that she never received the expert advice she was promised, that the items she received from StoresOnline did not work, and that the software was faulty and provided no helpful information. She indicated that when she complained to the Company, they offered her what was described as professional coaching assistance, also known as "executive mentoring," which cost her an extra $4,113. She stated that the coaching sessions were simply a few 20-30 minute phone conversations that allegedly informed her of where she could find solutions to her problems.

45.     A fourth customer filed a complaint stating that he had attended an StoresOnline seminar in Austin, Texas during which he purchased a Web site, programs, and services to start his

online business. After paying StoresOnline, he did not receive any of the services that were promised. This customer also stated that he did not receive any of the expert advice that was promised and that the software he was sold did not work. This customer stated he called the Company, received no help, but was told that if he wanted extra help he would have to pay an extra charge that ranged from $3,000-$10,000. He also complained that there were numerous extra charges for services that he believed were part of the package he purchased at the seminar.

46.     A fifth customer stated that she attended a StoresOnline seminar in San Antonio, Texas at which she purchased a Web site package, but that the software she received did not work properly and when she tried to return it, the Company indicated there were no refunds after three days of purchase. This customer reported she unsuccessfully contacted the Company in order to get help with the software problems to no avail and that she tried to return the materials, but the Company would not take them back, stating that they would not give any refunds.

47.     A sixth customer filed a complaint indicating that she attended a seminar at which StoresOnline represented that they could get her started in an Internet business by selling her all the software, help, and resources needed. She stated she was told that the software was user friendly and problem free. However, the software she received from StoresOnline was faulty and she had numerous problems installing and working with it. She indicated that she was later contacted by another StoresOnline representative who tried to sell her extra assistance in order to get her system running at a "high level."

48.     To make matters worse, when asked to justify the recent large stock sales by iMergent's executives during the February 25, 2005 conference call – over $6.5 million worth just weeks before the filing of the Texas Attorney General's lawsuit was announced, knowing that the Washington state lawsuit and cease and desist order had not been disclosed and that the Company

- 18 -

faced numerous complaints by customers in many states, including Texas – Danks admitted he sat down with management, looked at their personal financial situations, decided the stock price was high and decided many iMergent executives should sell stock into the market. In fact, Danks actually stated during the February 25, 2005 conference call that he was "really glad that some of the key management was able to take some money off the table" when they did.

49.    The market reacted swiftly to the February 2005 news, with the Company's stock price collapsing from a Class Period high of over $25 per share on February 9, 2005 to below $12 per share by March 1, 2005 when its trading was temporarily halted, erasing over $150 million in market capitalization.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

50.    Plaintiff incorporates ¶¶1-49 by reference.

51.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

52.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- 19 -

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of iMergent publicly traded securities during the Class Period.

53.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for iMergent publicly traded securities. Plaintiff and the Class would not have purchased iMergent publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

54.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of iMergent publicly traded securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

55.     Plaintiff incorporates ¶¶1-54 by reference.

56.     The Individual Defendants acted as controlling persons of iMergent within the meaning of §20(a) of the 1934 Act. By reason of their positions as officers and/or directors of iMergent, and their ownership of iMergent stock, the Individual Defendants had the power and authority to cause iMergent to engage in the wrongful conduct complained of herein. iMergent controlled each of the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants and iMergent are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased iMergent publicly traded securities on the open market during the Class Period (the "Class").  Excluded from the Class are defendants.

58.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  iMergent had more than 11.7 million shares of stock outstanding, owned by hundreds of persons.

59.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the 1934 Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     Whether the prices of iMergent's publicly traded securities were artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

60.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

- 21 -

61.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

62.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to FRCP 23;

B.      Awarding plaintiff and the members of the Class damages, including interest;

C.      Awarding plaintiff reasonable costs, including attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED: March 8, 2005                    ANDERSON & KARRENBERG, P.C.


THOMAS R. KARRENBERG
JON V. HARPER
700 Bank One Tower
50 West Broadway
Salt Lake City, UT 84101
Telephone: 801/534-1700
801/364-7697 (fax)

- 22 -

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
MARY K. BLASY
401 B Street, Suite 1600
San Diego, CA  92101-4297
Telephone:  619/231-1058
619/231-7423 (fax)

LAW OFFICES OF ALFRED G.
  YATES, JR., P.C.
ALFRED G. YATES
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA  15219
Telephone:  412/391-5164
412/471-1033 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt iMergent.doc

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Elliott Firestone ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has reviewed the class action complaint and authorizes its filing.

2.     Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff's transactions in Imergent Inc. that are the subject of this action are as follows.
See attached Schedule

5.     During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class under the federal securities laws, except as follows: (list, if any)

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2 day of March, 2005

Plaintiff

## Imergent, Inc. Schedule
## Transactions
## Elliot Firestone

| Shares Bought | | | Shares Sold | | | |
|---|---|---|---|---|---|---|
| # of Shares | Date | $ Per Share | # of Shares | Date | $ Per Share | Total Gain/(Loss) |
| 250 | 01/14/05 | $16.6000 | 250 | 01/27/05 | $18.2500 | $412.50 |
| 97 | 01/14/05 | $16.6000 | 97 | 02/01/05 | $20.3800 | $366.66 |
| 200 | 01/20/05 | $17.9000 | 153 | 02/01/05 | $20.3800 | $496.00 |
| | | | 47 | 02/24/05 | $18.5300 | $29.61 |
| 250 | 01/27/05 | $17.5000 | 250 | 02/24/05 | $18.5300 | $257.50 |
| 150 | 02/09/05 | $24.9900 | 103 | 02/24/05 | $18.5300 | ($969.00) |
| | | | 47 | 02/25/05 | $15.9000 | ($427.23) |
| 150 | 02/18/05 | $22.3600 | 150 | 02/25/05 | $15.9000 | ($969.00) |
| 150 | 02/23/05 | $20.4000 | 53 | 02/25/05 | $15.9000 | ($675.00) |
| | | | 97 | 03/01/05 | $12.5000 | ($766.30) |
| 100 | 02/23/05 | $19.6600 | 100 | 03/01/05 | $12.5000 | ($716.00) |
| 50 | 02/23/05 | $19.6600 | 50 | 03/01/05 | $12.5000 | ($358.00) |
| 1397 | | | 1397 | | | ($3,318.26) |