IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| IN RE IMERGENT SECURITIES LITIGATION, | **MEMORANDUM DECISION AND ORDER** |
| | CLASS ACTION |
| This Document relates to: All Actions | Master File No. 2:05-CV-204 |
| | Judge Dee Benson |

This is a securities class action on behalf of all individuals and entities who purchased iMergent's common stock between October 15, 2002 and October 7, 2005 (the "Class Period"). The action was originally brought against iMergent and certain officers and directors as well as iMergent's outside auditor, Grant Thornton LLP, for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934.  In March of 2008, iMergent and its officers and directors reached a settlement agreement with the plaintiff class ("plaintiffs") and as part of that settlement, agreed to provide plaintiffs with documentary and other evidence in support of their action against Grant Thornton.  Accordingly, and as a result of the settlement agreement, plaintiffs' only remaining claim is against iMergent's outside auditor, Grant Thornton, for violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

1

On March 4, 2009, defendant Grant Thornton filed a Rule 12(b)(6) Motion to Dismiss With Prejudice Plaintiffs' Second Amended Complaint. (Dkt. No. 152.)  After briefing by the parties, the court heard oral argument on the motion.  Plaintiffs were represented by Ira M. Press and Jefferson W. Gross.  Defendant was represented by Gary Bendinger.  Having considered the memoranda submitted by the parties, the relevant law, and the arguments of counsel, the court enters the following Memorandum Decision and Order.

## BACKGROUND

In deciding a motion to dismiss a §10(b) action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure the court presumes the truth of all well-pleaded facts in the complaint. Tal v. Hogan, 453 F.3d 1244, 1252 (2006), cert. denied, 549 U.S. 1209 (2007).  In addition, the court may consider "other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, LTD., 551 U.S. 308, 322 (2007).  With these standards in mind, the court considers the facts and allegations in this case.

iMergent is an "e-services company" that sells Web-based technology services to entrepreneurs and small businesses.  Its primary services include 90-minute Internet preview training sessions and Internet training workshops.  The Company sells its proprietary Stores Online Software and training services for users to market products, accept online orders, analyze marketing performance, and manage pricing and customers.  (Second Am. Compl. ¶ 2.)  In addition to software, the Company offers site development, Web hosting, marketing, and

mentoring products.  (Id.)

Defendant Grant Thornton LLP, is a worldwide firm of certified public accountants, auditors and consultants.  Grant Thornton served as iMergent's auditor and principal accounting firm from February 4, 2002 until October 7, 2005.  (Second Am. Compl. ¶ 106.)  Pursuant to its contract with iMergent, Grant Thornton advised the Company on the application of Generally Accepted Accounting Principles (GAAP) to revenue recognition on the sale of software. Grant Thornton was also obligated to audit iMergent's financial statements in accordance with Generally Accepted Auditing Standards (GAAS), and to report the results of those audits and quarterly reviews to iMergent, its board of directors, and members of the investing public.

iMergent's revenues were primarily generated from the sale of licenses to use a product called Stores Online Software (SOS).  The SOS is a Web-based software product that enables the customer to develop an Internet website without additional assistance from the Company.  The Company offered 24-month installment contracts to customers who preferred an Extended Payment Term Arrangement (EPTA) as a method of payment for the SOS license. Approximately 40% of iMergent's SOS sales were financed on credit through EPTAs.  Many of these EPTAs were eventually written off as bad debt, and iMergent historically collected only 53% of the payments owed through the EPTA contracts.

Although the collection rate hovered around 53%, iMergent had a "revenue recognition policy" which recognized 100% of the revenue from EPTA contracts at the time of product delivery.  The authoritative GAAP pronouncement governing revenue recognition from the sale of software is Statement of Position 97-2, *Software Revenue Recognition* (SOP 97-2).  SOP 97-2

provides that revenue from the sale of software should be recognized when the following four specific criteria are met: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred; (3) the fee is fixed and determinable, and (4) *collectibility is probable*. (Second Am. Compl. ¶ 75.)  iMergent's revenue recognition policy expressly incorporated SOP 97-2 and stated that "all of the[] criteria [of SOP 97-2] are met when a customer purchases the SOS product and the three-day rescission period expires."  (Second Am. Compl. ¶ 74.)  iMergent interpreted the phrase "collectibility is probable" within SOP 97-2 as meaning collectibility is "more likely than not."  Therefore, because iMergent's historical collection rate of 53% was "more likely than not" (i.e., greater than 50%) iMergent recognized 100% of the revenue from the EPTA contracts.

As iMergent's independent auditor, Grant Thornton was "in constant close contact with iMergent personnel, and was at all times fully familiar with iMergent's sales, collection and revenue recognition practices and history."  (Pls.' Mem. in Opp'n at 4.)  More specifically, Grant Thornton was aware of iMergent's revenue recognition policy and advised iMergent on this policy.[1]  (Second Am. Compl. ¶ 33.)  According to plaintiffs, Grant Thornton knew that the collection rate for EPTAs was approximately 53% but nonetheless advised iMergent that this rate of collectibility met the criteria of SOP 97-2 that "collectibility is probable," and therefore

_____

[1]The relevant documents suggest that iMergent's revenue recognition policy was implemented and audited by iMergent's prior outside auditor before Grant Thornton was hired in February of 2002.  (Def.'s Reply, Ex. A (iMergent Inc., Form 10-Q, Nov. 22, 2000); Def.'s Reply, Ex. B (iMergent Inc., Annual Report Form 10-K, Oct. 15, 2001); Def.'s Reply, Ex. C (iMergent Inc., Annual Report Form 10-K, Oct. 15, 2002 (providing "[t]his new revenue recognition policy was in effect for the last three quarters of fiscal year 2001 and for all of fiscal year 2002")); Def.'s Reply, Ex. D (iMergent Inc., Annual Report Form 10-K, Sept. 29, 2003).)

the Company's immediate recognition of 100% revenue under these circumstances complied with GAAP.  (Id. ¶¶ 44, 46, 85.)

During the time relevant to this action, iMergent continued to follow this policy of revenue recognition and filed the requisite financial statements with the Securities and Exchange Commission.  Grant Thornton, acting as iMergent's outside auditor, certified iMergent's financial statements for fiscal years ended in June 30, 2002, 2003 and 2004, and provided "unqualified Reports of Independent Auditors" which contained "clean" audit opinions. (Id. ¶ 8.)

On two separate occasions the Securities and Exchange Commission (SEC) inquired of iMergent regarding its revenue recognition practices.  The first occurred on January 31, 2002, whereupon iMergent received a Comment Letter from the SEC asking about iMergent's Fiscal Year 2001.  Although Grant Thornton was not iMergent's auditor for fiscal year 2001, Grant Thornton assisted iMergent in responding to the SEC.  (Second Am. Compl. ¶¶ 138, 141-42.) With regard to revenue recognition, iMergent's 2002 response referenced SOP 97-2 and explained the Company's revenue recognition practice by simply stating that "collectibility is probable" with regard to the sales in question.  (Def.'s Mem. in Supp., Ex. B.)  iMergent also provided the SEC with some historical collection figures and percentages, however, none of these figures explicitly identified the ultimate or final collection rate on EPTA contracts. Accordingly, although iMergent responded to the SEC's inquiry, it did not provide information or numerical figures sufficient to inform the SEC that iMergent was applying a "more likely than not" definition for  "collectibility is probable."  (Id.)

Approximately one year later, on June 30, 2003, prior to the completion of the 2003

audit, Wayne Kerr, a senior manager at Grant Thornton, prepared an internal "Bad Debt Expense Analysis" for iMergent.  Within this analysis, Mr. Kerr reviewed among other things, the Company's under-accrual of the allowance for bad debts, the historical collection rates on finance contracts, and remarked on iMergent's collectability standard.  Mr. Kerr stated: "While the criteria of 'probable of collection' are somewhat vague, a collection history of greater than 50% seems to indicate that management's assertion of collectibility is reasonable."  (Def.'s Mem. in Supp., Ex. N at 2.)

 The SEC's second inquiry into iMergent's revenue recognition practices occurred in May 2005.  By letter dated May 19, 2005, the SEC stated that it had reviewed the Company's Form 10-K for the fiscal year ended June 30, 2004, and wanted the Company to "explain how it had been able to conclude that collection of . . . installment contracts was probable, or likely to occur, in order to recognize revenue upon delivery."  (Second Am. Compl. ¶ 149.)  Once again, iMergent sought assistance from Grant Thornton in responding to the SEC.  Initially, Grant Thornton indicated there was "no problem" and it was just a matter of drafting a response because the collection of installment contracts was "probable, or likely to occur, and its revenue recognition was in accordance with GAAP."  (Id. ¶ 150.)  Shortly thereafter, however, Grant Thornton became "uncommunicative" and iMergent was told that Grant Thornton could not respond to the SEC's letter because the people at the national office were "occupied with other more urgent matters."  (Id. ¶ 154.)

 On July 26, 2005, the SEC informed iMergent that the Company's response was "seriously overdue."  (Second Am. Compl. ¶ 158.)  Accordingly, on July 27, 2005, without the

assistance of Grant Thornton, iMergent responded to the SEC's comment letter, stating that with

regard to "probability of collection . . . the historical collection rates . . . exceed 50% and,

therefore, collection for installment contracts is considered probable."  (Id. ¶ 159.)  The SEC

responded, stating: "In order to be considered probable in the context of SOP 97-2 . . . the

likelihood of collection must be *substantially* higher than 50%.  The threshold that you have

applied appears to be more accurately described as 'more likely than not,' which is not

appropriate in evaluating probability for purposes of software revenue recognition."  (Id. ¶ 160.)

 According to iMergent, after informing Grant Thornton about the SEC's response, Grant

Thornton's general counsel, "in a 180 degree about face," stated that Grant Thornton's National

Office did not agree with iMergent's existing revenue recognition practice and would not

support it.  Additionally, Grant Thornton indicated that it would withdraw all previously issued

audit opinions. (Id. ¶ 165.)

 Shortly thereafter, on August 19, 2005, iMergent announced its intention to restate its

financial statements for fiscal years 2002, 2003, and 2004 in order to correct the fact that revenue

and income for those periods had been improperly reported.  (Second Am. Compl. ¶¶ 64, 166.)

That same day, Grant Thornton sent a letter to iMergent's Audit Committee stating that it had

withdrawn its opinions on the audits of the Company's annual financial statements and its

reviews of the interim financial statements.  On September 29, 2005, iMergent issued a press

release stating that, upon suggestion by Grant Thornton, the Company hired AlixPartners to

assist in determining the appropriate interpretation and application of GAAP related to revenue

recognition.  On October 7, 2005, iMergent dismissed Grant Thornton.  (Id. ¶ 171.)  Plaintiffs

allege that the impact of the restatement was "drastic," resulting in an overstatement of over

$100 million dollars in total revenue during the class period.  (Pls.' Opp'n at 18.)  As a result of

the restatement, iMergent's stock prices fell significantly.

       The plaintiffs in this case–individuals and entities who purchased iMergent's common

stock between October 15, 2002 and October 7, 2005–allege that Grant Thornton (1) falsely

represented in SEC filings that is audits of iMergent's financial statements for fiscal years 2002,

2003 and 2004 had been conducted in accordance with GAAS, and (2) wrongfully issued "clean"

or unqualified opinions that iMergent's financial statements complied with GAAP.  (Second Am.

Compl. ¶¶ 15, 26 (2002), 59 (2003), 62 (2004).)  More specifically, plaintiffs allege that Grant

Thornton "knew or was reckless in not knowing" that iMergent's accounting policy for revenue

recognition was improper and not in accordance with GAAP–that "probable of collection"

required substantially more than a 50.1% likelihood of collection.  (Id. ¶¶ 86, 108, 136.)

Plaintiffs assert that these "false statements" by Grant Thornton deceived the investing public,

artificially inflated and maintained the market price of iMergent common stock, and caused the

plaintiffs to purchase iMergent stock at artificially inflated prices.  (Second Am. Compl. ¶¶ 208-

211.)

       Based on this conduct, plaintiffs' assert that Grant Thornton violated Section 10(b) of the

Exchange Act, 15 U.S.C.A. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.[2]  Grant Thornton

---

    [2]Section 10(b) applies to any acts connected with the sale or purchase of a security and
prohibits the use of "any manipulative or deceptive device or contrivance in contravention of
such rules and regulations as the [SEC] may prescribe."  15 U.S.C.A. § 78j(b).  Implementing
this statute, SEC Rule 10b-5 makes it unlawful to "make any untrue statement of a material fact
or to omit to state a material fact necessary in order to make the statements made . . . not
misleading."  17 C.F.R. §  240.10b-5.

now moves to dismiss plaintiffs' Second Amended Complaint on the grounds that plaintiffs have

failed to plead fraud with the specificity required under the Private Securities Litigation Reform

Act, 15 U.S.C. § 78u-4(b) and the Supreme Court's recent decision in Tellabs, Inc. v. Makor

Issues & Rights, LTD, 551 U.S. 308 (2007).

### DISCUSSION

**A.  Motion to Dismiss Standards**

In deciding a motion to dismiss for failure to state a claim upon which relief may be

granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court presumes the truth

of all well-pleaded facts in the complaint, but need not consider conclusory allegations.  Tal v.

Hogan, 453 F.3d 1244, 1252 (10th Cir. 2006), cert. denied, 549 U.S. 1209 (2007). The court is

not bound by a complaint's legal conclusions, deductions and opinions couched as facts.  Bell

Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).  Further, though all reasonable inferences must

be drawn in the non-moving party's favor, a complaint will only survive a motion to dismiss if it

contains "enough facts to state a claim to relief that is plausible on its face." Id. at 570.  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal,

129 S. Ct 1937, 1949 (2009).

**B.  Securities Fraud Pleading Requirements**

Allegations of securities fraud under § 10(b) and Rule 10b-5 are subject to two stringent

pleading requirements.  First, Rule 9(b) of the Federal Rules of Civil Procedure requires that "in

all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated

with particularity."  Fed. R. Civ. P. 9(b).  Second, and perhaps more importantly in this case,

plaintiffs' claim must satisfy the heightened pleading requirements of the Private Securities

Litigation Reform Act ("PSLRA").  The PSLRA goes further than Rule 9(b) by requiring a

complaint alleging securities fraud to "specify each statement alleged to have been misleading,

the reason or reasons why the statement is misleading, and, if an allegation regarding the

statement or omission is made on information and belief, the complaint shall state with

particularity all facts on which that belief is formed.  Adams v. Kinder-Morgan, Inc., 340 F.3d

1083, 1095 (10th Cir. 2003) (quoting 15 U.S.C.A. § 78u-4(b)(1)).  With regard to the element of

scienter, the PSLRA requires that plaintiffs alleging securities fraud must "state with

particularity facts giving rise to a strong inference that the defendant acted with the required state

of mind."  Id. (quoting 15 U.S.C.A. §78u-4(b)(2)).

    The United States Supreme Court recently clarified the "strong inference of scienter"

pleading requirement set forth in the PSLRA.  In Tellabs, Inc. v. Makor Issues & Rights, Ltd.,

551 U.S. 308 (2007), the Supreme Court stated:

> The inference of scienter must be more than merely "reasonable" or "permissible"
> – it must be cogent and compelling, thus strong in light of other explanations.  A
> complaint will survive . . . only if a reasonable person would deem the inference
> of scienter cogent and at least as compelling as any opposing inference one could
> draw from the facts alleged.

Id. at 324.  In making this inquiry, the court must consider "whether *all* of the facts alleged,

taken collectively, give rise to a strong inference of scienter, not whether any individual

allegation, scrutinized in isolation, meets that standard."  Id. at 323.

    To state a claim under §10(b) and Rule 10b-5 of the Securities Exchange Act, plaintiffs

must sufficiently allege that the defendant: (1) made a material misrepresentation or omission;

(2) with scienter; (3) in connection with the purchase or sale of a security; (4) upon which the

plaintiff relied; (5) that the plaintiff suffered an economic loss; and (6) that the material

misrepresentation was the cause of that loss.  In re Williams Secs. Litig. WCG Subclass, 558

F.3d 1130, 1136 (10th Cir. 2009), citing Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552

U.S. 148 (2008).  Here, Grant Thornton challenges plaintiffs' Second Amended Complaint only

as to the element of scienter.

**C.  Scienter under Section 10(b) and Rule 10b-5**

The requisite "scienter" for a § 10(b) claim is "a mental state embracing intent to deceive,

manipulate, or defraud."  Tellabs, 551 U.S. at 319; Ernst & Ernst v. Hochfelder, 425 U.S. 185,

194 n.12 (1976).  The United States Court of Appeals for the Tenth Circuit has held that a

plaintiff may meet the scienter requirement by showing that the defendant acted recklessly, but

has also warned that "[c]ourts have been cautious about imposing liabilities for securities fraud

based on reckless conduct."  City of Philadelphia v. Fleming Cos., Inc., 264 F.3d 1245, 1260

(10th Cir. 2001).  The Tenth Circuit has defined recklessness as "conduct that is an extreme

departure from the standards of ordinary care, and which presents a danger of misleading buyers

or sellers that is either known to the defendant or is so obvious that the actor must have been

aware of it."  City of Philadelphia v. Fleming Cos. Inc., 264 F.3d 1245, 1258 (10th Cir. 2001); see

In re Williams Secs. Lit., 496 F.Supp.2d 1195, 1289 (N.D. Okla. 2007) (providing that

recklessness on the part of an independent auditor has been defined as "highly unreasonable

conduct, involving not merely simple, or even inexcusable negligence, but an extreme departure

from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it") ; New Jersey v. Sprint Corp., 314 F.Supp.2d 1119, 1148 (D. Kan. 2004) (same); see also In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 975 (9th Cir. 1999) ("Recklessness is a form of intent rather than a greater degree of negligence."); Greebel v. FTP Software, Inc., 194 F.3d 185, 199 (1st Cir. 1999) (stating that "[w]e perceive it to be not just a difference in degree, but also in kind," in describing the difference between negligence and recklessness under Section 10(b)).

When the securities fraud claim is brought, as it is here, against an outside auditor, many courts have held that the meaning of recklessness is "especially stringent."  See, e.g., PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 693 (6th Cir. 2004); In re Dell Inc. Securities Litigation, 591 F.Supp.2d 877 (W.D. Tex. 2008); see also, e.g., Pegasus Fund, Inc. v. Laraneta, 617 F.3d 1335, 1341 (9th Cir. 1980) (auditor's recklessness "must come closer to being a lesser form of intent (to deceive) than merely a greater degree of ordinary negligence").  Indeed, many courts have held that "[r]ecklessness on the part of an independent auditor entails a mental state so culpable that it 'approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company.'" PR Diamonds, 364 F.3d at 693 (quoting Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 121 (2nd Cir. 1982)); Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000).

For purposes of a securities fraud claim against an outside auditor, recklessness "has persuasively been defined" within this circuit as

> requir[ing] more than a misapplication of accounting principles. [Plaintiffs] must
> prove that the accounting practices were so deficient that the audit amounted to
> no audit at all, or an egregious refusal to see the obvious, or to investigate the
> doubtful, or that the accounting judgments which were made were such that no

reasonable accountant would have made the same decisions if confronted with the
same facts.

In re Williams Securities Litigation, 496 F.Supp.2d 1195, 1289 (N.D. Okla. 2007) (quoting New
Jersey v. Sprint Corp., 314 F.Supp.2d 1119, 1148 (D. Kan. 2004)); see Ley v. Visteon Corp.,543
F.3d 801 (6th Cir. 2008); In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256 (3d Cir. 2006);
DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 390 (9th Cir. 2002); In re
Scottish RE Group Sec. Litig., 524 F.Supp.2d 370, 398 (S.D.N.Y. 2007).  By way of contrast,
"allegations of a seriously botched audit," while perhaps suggesting negligence or even gross
negligence, "do not give rise to a strong inference that the auditor acted with an intent to defraud,
conscious misconduct, or deliberate recklessness, as is required in a securities fraud case."
DSAM Global Value Fund, 288 F.3d at 387; see also Ezra Charitable Trust v. Tyco
International, Ltd., 466 F.3d 1, 12 n.10 (1st Cir. 2006) (providing that allegations of a "poor audit
[are] not equivalent to alleging an intent to deceive" and even if auditor was "inexcusably
negligent," because such conduct is "well short of the conscious misconduct or extreme
recklessness necessary to allege scienter").

Applying these standards, and considering all of the alleged facts collectively and in
plaintiffs' favor, the court concludes that plaintiffs have failed to sufficiently plead facts to raise
the strong inference of scienter required to overcome Grant Thornton's motion to dismiss.
Although this conclusion is based on a holistic assessment of plaintiffs' allegations, see Tellabs,
551 U.S. at 325, each of plaintiffs' allegations and arguments are discussed individually for
organizational purposes.

### 1. GAAP & GAAS Violations

The main focus of plaintiffs' claim in this case is that Grant Thornton engaged in a reckless misapplication of GAAP SOP 97-2 – applying a "more likely than not" standard for probability of collection – in order to improperly accelerate the recognition of a significant amount of revenue. (Pls.' Opp'n at 18.)  Generally accepted accounting principles (GAAP) are a set of basic postulates and broad accounting principles pertaining to business enterprises.  These principles, approved by the American Institute of Certified Public Accountants (AICPA), establish guidelines for measuring, recording and classifying the transactions of a business entity.  See, e.g., SEC v. Price Waterhouse, 797 F. Supp. 1217, 1222 n.17 (S.D.N.Y. 1992). Generally accepted auditing standards (GAAS) embody the general standards prescribed by the AICPA for the conduct of auditors in the performance of an examination.  Id.  The AICPA professional ethics code requires compliance with GAAP and GAAS when giving an opinion on financial statements.  SEC v. Price Waterhouse, 797 F. Supp. 1217, 1222 n.17 (S.D.N.Y. 1992).

As explained above, the GAAP provision for revenue recognition from the sale of software is Statement of Position 97-2, *Software Revenue Recognition* (SOP 97-2).   SOP 97-2 expressly requires payment collection to be "probable" in order to recognize revenue from a sale. Footnote 5 to SOP 97-2 states: "The term *probable* is used in this SOP with the same definition as used in FASB Statement No. 5, *Accounting for Contingencies*."  In turn, Financial Accounting States Board (FASB) Statement No. 5 states:

> [T]he likelihood that a future event [will occur] can range from probable to remote.  This statement uses the terms probable, reasonably possible, and remote to identify three areas within that range, as follows:
> a. Probable.  The future event or events are likely to occur.

14

          b. <u>Reasonably possible</u>.  The chance of the future event or events
          occurring is more than remote but less than likely.
          c. <u>Remote</u>. The chance of the future event or events occurring is slight.

The controversy in this case centers on Grant Thornton's interpretation of "probable" as contained in SOP 97-2 and described in FASB Statement No. 5 – that a "future event or events are likely to occur."  Grant Thornton acknowledges that it applied a "more likely than not" standard, but asserts that SOP 97-2 fails to provide a "bright line" definition for the term "probable," and therefore it present a "complex area of accounting" requiring "significant professional judgment."  (Def.'s Mem. in Supp. at 13, 17.)  According to Grant Thornton, under these circumstances, a difference in opinion as to the proper definition of "probable" is insufficient to infer scienter.  (Def.'s Mem. in Supp. at 13.)

Plaintiffs on the other hand, allege that Grant Thornton was reckless in applying a "more likely than not" standard because "the relevant literatures makes clear" that "probable" requires a collection rate that is significantly higher.  (Second Am. Compl. ¶ 86.)  As support for this argument, plaintiffs rely on FASB Staff Implementation Guide Q & A –*Application of FASB Statement 5 and 114 to a Loan Portfolio*.  It provides: "The [FASB] recognized that application of the term probable in practice requires judgment, and to clarify its intent the [FASB] reiterated the guidance in Statement 5 that probable does not mean virtually certain.  Probable is a higher level of likelihood than 'more likely than not.'" (<u>Id.</u> ¶ 80.)  Additionally, plaintiffs cite Wanda A. Wallace's textbook, <u>Auditing</u>, as support for the proposition that "*probable* is interpreted quantitatively by accounting practitioners to be in the 78% range."  (Second Am. Compl. ¶ 82.)

Even accepting plaintiffs' allegations as true, that Grant Thornton violated GAAP and

GAAS by defining probable as more likely than not, it is well established that GAAP violations, *without more*, fail to raise an inference of scienter.  City of Philadelphia v. Fleming Cos., Inc., 264 F.3d 1245, 1261 (10th Cir. 2001).  And, although plaintiffs' complaint sufficiently alleges a GAAP violation, what is missing in this case are allegations sufficient to support the "something more."  See, e.g., In re Sportsline.com Sec. Litig., 366 F.Supp.2d 1159, 1165 (S.D. Fla. 2004) ("Violations of GAAP, without more, may establish negligence, but can never establish scienter."); see also, e.g., Novak v. Kasaks, 216 F.3d 300, 309 (2nd Cir. 2000) ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim.").

For example, while sources referenced by plaintiffs' state that "probable of collection" requires more than a 50.1% likelihood of collection, there is nothing to indicate that Grant Thornton was aware of, but turned a blind eye to, this "relevant literature."  More specifically, although FASB Staff Implementation Guide Q & A 114  #8 explicitly states that "probable is a higher level of likelihood than 'more likely than not,'" there is nothing in either SOP 97-2 or FASB Statement No. 5 that refers to the Implementation Guide in general, or to Q & A 114 # 8 in particular.  Additionally, the Implementation Guide's weight of authority is low, ranking only fourth in the hierarchy of GAAP sources.  The Meaning of Present Fairly in Conformity with GAAP, AU § 411.18 (Am. Inst. of Certified Pub. Accountants 2008); (Def.'s Mem. in Supp. at 6).  That the Implementation Guide is low-ranking GAAP authority does not mean that it should be disregarded, but it does raise doubt as to whether its explanation of "probable" was so obvious that Grant Thornton must have known about it.

16

Additionally, with regard to plaintiffs' cited text, although it fairly supports plaintiffs' argument that "probable" requires something significantly higher than more-likely-than-not, it also acknowledges that there is a general debate over the "probable" standard with room for professional judgment.  See, e.g., Wanda A. Wallace, Auditing, Third Edition, p.995 (1995).  As such, plaintiffs' after-the-fact recitation of a non-GAAP publication fails to provide much of an inference that Grant Thornton "must have been aware" of it.

### 2.  Access to the Company's Records and Information

Similarly, the court concludes that plaintiffs' allegation that Grant Thornton had virtually unlimited access to iMergent's operations, documents and practices is also unavailing.  The court has already assumed, for purposes of deciding this motion, that Grant Thornton was fully aware of both the 53% collection rate and the more-likely-than-not standard for "probable of collection" in iMergent's revenue recognition policy.  While allegations of an auditor's unlimited access to a Company's records are often relevant in a case where the company being audited is alleged to have engaged in fraud and the auditor's access to company records should have alerted the auditor to that fraud, this is not such a case. See, e.g., In re MicroStrategy inc. Sec. Litig., 115 F.Supp.2d 620, 653 (E.D. Va. 2000) (providing that accountants mere access to company's information does not necessarily mean it was aware of *the company's fraud*, but the greater the access and involvement the more support an inference of scienter takes on).

In this case, aside from its knowledge of the 53% collection rate, it is unclear precisely what plaintiffs' believe Grant Thornton should have discovered within iMergent's company records.  Plaintiffs have failed to allege any specific Company documents, records or information

that Grant Thornton failed to obtain or inspect that would have alerted them to the fact that

iMergent's interpretation of SOP 97-2 was improper.  Under these circumstances, the court finds

that such conclusory allegations of access to unspecified 'internal records' are insufficient to

support a claim of 'knowledge' of fraud or 'reckless disregard' on the part of an auditor.  Ley v.

Visteon Corp., 540 F.3d 376, 392-93 (6th Cir. 2008); PR Diamonds, 364 F.3d at 695-96; In re

Dell, 591 F.Supp.2d 877, 901-02 (W.D. Tex. 2008).

### 3.  Magnitude of the Restatement

Plaintiffs also claim that the magnitude of the fraud and size of the restatement in this

case support an inference of scienter.  More specifically, plaintiffs's claim that the impact of the

Restatement on the Company "was drastic and resulted in an overstatement of over $100 million

dollars in total revenue during the class period."  (Pls.' Opp'n at 18.)  Although significant

overstatements of revenue can support a finding that the defendant acted with scienter, Merby v.

Lay, 258 F.Supp.2d 576, 626, n.55 (S.D. Tex. 2003), allowing an inference of scienter based

solely on the magnitude of a restatement "would eviscerate the principle that accounting errors

along cannot justify a finding of scienter."  Fidel v. Farley, 392 F.3d 220, 231 (6th Cir. 2004).  In

this case, while plaintiffs provide great detail regarding the size of the restatement (Pls.' Opp'n

at 18-20), plaintiffs provide no factual support or explanation as to how the magnitude of the

restatement provides or enhances any inference that Grant Thornton acted with scienter.  See,

e.g., Reiger v. Price Waterhouse Coopers LLP, 117 F.Supp.2d 1003, (S.D. Cal. 2000) ("To avoid

undermining the policies of the Reform Act through reliance on hindsight and speculation, a

court should not infer an independent accountant's scienter based solely on the magnitude of its

client's fraud."), aff'd 288 F.3d 385 (9th Cir. 2002).  Accordingly, plaintiffs' allegations in this

regard fail to support a strong inference of scienter.[3]

### 4.  Red Flags

Perhaps the closest plaintiffs come to providing support for the allegation that Grant

Thornton should have known that the more-likely-than-not standard was improper is found in the

exchange between iMergent and the SEC in 2002.  Indeed, plaintiffs assert that the 2002 SEC

Comment Letter was one of a "multitude of red flags" that Grant Thornton deliberately

disregarded, evidencing reckless conduct.  (Pls.' Opp'n at 21.)  Red flags are "those facts which

come to the attention of an auditor which would place a reasonable auditor on notice that the

audited company was engaged in wrongdoing to the detriment of investors."  In re Eagle Bldg.

Tech. Sec. Litig., 319 F.Supp.2d 1318, 1328 (S.D. Fla. 2004).

Review of iMergent's response to the SEC reveals, however, that even though the

response was unartfully drafted, vague and therefore misleading with regard to the final

collection rates, there is nothing within the correspondence that would have alerted Grant

Thornton to the fact that it was using an incorrect standard for "probable of collection."  Beyond

this exchange, plaintiffs' "red flags" appear to be a rehash of their premise of a GAAP violation.

GAAP violations masquerading as red flags are insufficient to raise a strong inference of

---

[3]Plaintiffs also claim scienter can be inferred from the "pervasiveness of the fraud."
(Pls.' Opp'n at 20.)  Plaintiffs claim the fraud in this case was "pervasive" because Grant
Thornton served as iMergent's auditor for 3 years, during which time it repeatedly signed off on
the Company's revenue recognition policy.  (Pls.' Opp'n at 20.)  However, the alleged reckless
conduct in this case involved the misapplication of a single, albeit very important, GAAP
principle by an outside auditor, absent any allegation of fraud by the Company it was auditing.
As such, the court finds the facts of this case are unlike those cited by plaintiffs in which courts
have considered the pervasiveness of the fraud as supporting an inference of scienter.

scienter.  See PR Diamonds Inc., 364 F.3d at 695 (rejecting alleged red flags for simply

repeating GAAP improprieties).

Moreover, the plausibility of plaintiffs' allegations of scienter are further undercut by the

fact that Grant Thornton, while not expressly revealing its more-likely-than-not approach, did

not appear to be attempting to conceal or hide this approach either.  This is evident in the Wayne

Kerr "Bad Debt Analysis" drafted in June 2003.  (Def.'s Mem. in Supp., Ex. N.)  In the context

of evaluating iMergent's debts and "write-offs," he expressly stated his belief, whether correct or

not, that "a collection history of greater than 50% seems to indicate that management's assertion

of collectibility is reasonable."  (Id.)  Mr. Kerr's analysis demonstrates that Grant Thornton, in

accord with its duties as outside auditor, was both aware of and investigating the revenue

recognition issue, but was mistaken in its belief as to the proper standard.  While this may

suggest negligence, the court finds that it fails to rise to the level necessary to support a claim

under § 10(b) and Rule 10b-5.

Similarly, the court acknowledges that the collection figures contained in iMergent's

Form 10-Ks and other financial disclosure forms are confusing.  For example, iMergent's Form

10-K for the period ending June 30, 2003, states in one place that the EPTA collection rate has

historically been approximately 70% and two sentences later estimates an uncollectibility rate of

47%.  (Def.'s Mem. in Supp., Ex. C (Form 10-K for period ending 6/30/2003).)  However,

regardless of these contradictory figures, the form explicitly provides: "Despite our collection

efforts, we estimate that approximately 47% of the gross amount of all EPTAs that we enter into,

both sold to finance companies and retained by us, will ultimately be determined uncollectible."

(Id.)  Although admittedly confusing, this disclosure tends to negate any inference that Grant

Thornton intended to deceive anyone with regard to its interpretation of probable of collection.

See, e.g., Weiss v. Priceline.com, Inc., 330 Fed Appx. 230, 232 (2d Cir. May 22, 2009) ("The

plausibility of Plaintiffs-Appellants' allegations of scienter is further undercut by the fact that the

accounting treatment of the warrant was discussed in detail in Priceline.com's 1999 financial

statement.  This discussion tends to negate any inference that Deloitte intended to mislead the

investing public by falsifying the warrant's accounting treatment.").

### 5.  Motive

Another factor weighing against plaintiffs' inference of scienter is Grant Thornton's lack

of motive to engage in fraud.  While lack of motive is not dispositive, it remains a relevant

consideration in assessing scienter.  See Tellabs, 551 U.S. at 325.  In this case, the sole

motivation pled for Grant Thornton's alleged fraud was to "appease the client" in order to

continue to generate fees.  (Second Am. Compl. ¶ 109.)  However, a generalized economic

interest in professional fees is insufficient to establish an accounting firm's motive to commit

fraud.  In re Philip Servs. Corp. Secs. Litig., 383 F.Supp.2d 463, 470 (S.D.N.Y. 2004).

Notwithstanding the financial importance of iMergent's account to Grant Thornton, "it strains

reason that [Grant Thornton] would jeopardize its reputation, subject itself to civil and/or

criminal liability, and risk substantial financial penalties simply because it wanted to keep

[iMergent] as a client."  Id.; see In re Stone & Webster, Inc. Sec. Litig., 414 F.3d 187, 215 (1st

Cir. 2005) ("[A]bsent truly extraordinary circumstances, an auditor's motivation to continue a

profitable business relationship is not sufficient by itself to support a strong inference of scienter.

And here there was virtually nothing else.").[4]

## CONCLUSION

In sum, plaintiffs' allegations of GAAP violations, red flags and the magnitude of the fraud do not, individually or collectively, raise the strong inference required to defeat Grant Thornton's motion to dismiss. Stated another way, plaintiffs' allegations fail to raise an inference of fraudulent intent that is cogent and as compelling as the competing non-culpable inference that Grant Thornton was merely negligent in auditing iMergent. In general, the Second Amended Complaint alleges little more than an auditor that failed to properly define and interpret a single, albeit important, revenue recognition principle. Viewing plaintiffs' allegations with the required liberality, at best they raise an inference of negligence, but fail to raise an inference of fraud. Because no degree of negligence can satisfy the substantive element of scienter, Grant Thornton's motion to dismiss is **GRANTED**.

Additionally, Grant Thornton has asked this court to dismiss plaintiffs' Second Amended

---

[4]The issue of motive is especially peculiar in this case because plaintiffs have not alleged fraud on the part of the Company. Rather, plaintiffs ask this court to infer that Grant Thornton, in its capacity as an outside auditor, would perpetrate its own fraud, wholly independent of iMergent, for the sole purpose of appeasing iMergent and collecting its regular fees. As indicated above, courts have repeatedly found the "motive to collect fees" argument lacking, even when the company being audited was allegedly engaged in fraud. See, e.g., SEC v. Price Waterhouse, Inc., 797 F.Supp. 1217, 1242 (S.D.N.Y. 1992) ("It is highly improbable that an accountant would risk surrendering a valuable reputation for honesty and careful work by participating in a fraud merely to obtain increased fees."); In re Health Mgmt., Inc. Sec. Litig., 970 F.Supp. 192, 202 (E.D.N.Y. 1997) (determining it was not in auditor's economic self-interest to willingly condone fraud to preserve a fee that, though large account in field office, was "minute" relative to all of auditor's accounts). Accordingly, the court finds the argument even more unreasonable in this case, where plaintiffs seek to stretch the argument one step further.

Complaint with prejudice, thereby denying plaintiffs the opportunity to file another amended complaint.  (Def.s' Mot. to Dismiss at 3.)  Plaintiffs acknowledge that as part of the settlement agreement with iMergent, the Company agreed to provide plaintiffs with documentary and other evidence in support of their action against Grant Thornton.  Accordingly, plaintiffs' allegations in this case are the result of numerous interviews with current and former officers and directors of iMergent, and extensive access to Company records.  (Second Am. Compl. ¶ 32.) Notwithstanding this access to evidence, plaintiffs have failed to allege facts raising a cogent and compelling inference that Grant Thornton acted with scienter.  Given plaintiffs' extensive access to information prior to drafting the Second Amended Complaint, the court finds it unlikely that plaintiffs' could allege sufficient facts to establish a strong inference of scienter, and any amendment to the complaint would be futile.  Accordingly, defendant's motion to dismiss is granted **WITH PREJUDICE**.

Dated this 30th day of October, 2009.

_____
Dee Benson
United States District Judge