FILED
United States Court of Appeals
Tenth Circuit

<u>PUBLISH</u>

**January 20, 2011**

**UNITED STATES COURT OF APPEALS**

**Elisabeth A. Shumaker**
**Clerk of Court**

**TENTH CIRCUIT**

---

GREGORY DRONSEJKO; PEDRO
GARCIA; ANTHONY MIELEC,
PERLA SIERRA; CLAUDIO
BORGHESAN; JERALD F.
HASSLER; ANDY BEICHERT;
JEFFREY BASH; TOM CHEN;
CHRIS DAVIDSON; MICHAEL
SPEAKMAN,

     Plaintiffs - Appellants,

v.

GRANT THORNTON,

    Defendant - Appellee.

Nos. 09-4222 and 10-4074

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 2:05-CV-00204-DB)**

---

Ira M. Press (and Sarah G. Lopez of Kirby, McInerney, L.L.P.; Jonathan Gardner
and Carol Villegas of Labaton, Sucharow, L.L.P., New York, New York;
Jefferson W. Gross and Richard D. Burbidge of Burbidge, Mitchell & Gross, Salt
Lake City, Utah, on the brief), New York, New York, for Plaintiffs - Appellants.

Gary F. Bendinger (and Christopher B. Sullivan of Howrey, L.L.P., with him on
the brief), Salt Lake City, Utah, for Defendant - Appellee.

---

Before **TACHA**, **KELLY**, and **MURPHY**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

This is a securities class action pursuant to Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, brought on behalf of class members who purchased iMergent common stock between October 15, 2002 and October 7, 2005. Aplt. App. 47, 60-63, 105-107. The basis of the claim is improper revenue recognition that materially overstated revenues and earnings and, in August 2005, led to a restatement of iMergent's financial statements for fiscal years 2002, 2003, and 2004. Aplt. App. 70, 91, 106. All claims against iMergent and its directors have settled. Aplt. App. 47. The only remaining defendant is Grant Thornton, iMergent's independent auditor which expressed unqualified or "clean" opinions on iMergent's financial statements for those fiscal years. Aplt. App. 47, 48-49.

Plaintiffs-Appellants contend that Grant Thornton's actions relating to the revenue recognition policy—particularly its expression of unqualified opinions on the financial statements—artificially inflated the market price of iMergent's stock, causing them to suffer damages when the price declined upon news of the revenue recognition problems and restatement of earnings. Aplt. App. 107; Aplt. Br. 4-5.

Two appeals have been consolidated for argument and resolution. No. 09-4222 is Plaintiffs' appeal from the district court's dismissal of the Second

Amended Consolidated Complaint for failure to properly plead scienter under the

Private Securities Litigation Reform Act of 1995.  Aplt. App. 501.  No. 10-4074

is Plaintiffs' appeal from the district court's denial of their Rule 60(b) motion, in

which Plaintiffs sought the opportunity to file a new amended complaint to

incorporate newly discovered evidence.  Aplt. App. 663.  We have jurisdiction

pursuant to 28 U.S.C. § 1291, and we affirm.


<u>Background</u>

For purposes of this appeal, we must take as true all factual allegations in

the complaint.  <u>See</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308,

322 (2007).  iMergent is an e-services company that, *inter alia*, sold licenses for

software designed to help small businesses engage in e-commerce.  Aplt. App. 47,

57.  Roughly half of iMergent's revenue during the relevant period came from the

sale of licenses on the basis of Extended Payment Term Arrangements

("EPTAs").  Aplt. App. 57; Aplt. Br. 9.  Under EPTAs—as opposed to cash or

credit card sales—customers paid the purchase price in installments over a

twenty-four month period.  Aplt. App. 57.  iMergent recognized 100% of the

revenue from EPTA sales on the date the license was delivered; however, on

average iMergent collected only 53% of the total purchase price.[1]  Aplt. App. 57,

---

[1]  There is evidently a dispute as to whether EPTAS should have been
treated as one source of revenue or two for purposes of revenue recognition.
Aplt. Br. 9-10.  iMergent divided its EPTAs into two "tiers" depending upon the

159, 468.  On its 2003 and 2004 10K forms, iMergent disclosed that 47% of its

EPTA sales were uncollectible and recognized bad debt expense associated with

these sales, which reduced its total income.  Aplt. App. 158-59, 162-53, 467-68.

Further, iMergent wrote off the uncollectible EPTA accounts against an allowance

for doubtful accounts, with the allowance established at the time of sale.  Aplt.

App. 159, 468.

Companies must adhere to generally accepted accounting principles

("GAAP") when recognizing revenue in their publicly disclosed financial

statements.  See Ganino v. Citizens Utils. Co., 228 F.3d 154, 159 n.4 (2d Cir.

2000) (explaining how GAAP are established); 17 C.F.R. § 210.4-01(a)(1)

(incorporating GAAP into SEC disclosure requirements).  Under the American

Institute of Certified Public Accountants ("AICPA") Statement of Position 97-2

("SOP 97-2")—the relevant GAAP for our purposes—companies may

immediately recognize revenue from software licenses sold on the basis of

extended-term contracts so long as: (1) persuasive evidence of an arrangement

exists; (2) delivery of the product has occurred; (3) the fee is fixed and

determinable; and (4) collectibility is probable.  Aplt. App. 49, 57; Barrie v.

---

credit rating of the purchaser.  Aplt. App. 49.  So-called "A-tier" EPTAs had a
collection rate of greater than 50% (neither party provides the exact percentage),
and "B-tier" EPTAs had a collection rate of less than 50%.  Aplt. App. 49.
iMergent combined these two tiers for purposes of recognizing revenue, whereas
Plaintiffs imply that they should have been treated separately. Id.; Aplt. Br. 9-10.
This dispute has no effect on the outcome of this case.

Intervoice-Brite, Inc., 397 F.3d 249, 256 (5th Cir. 2005) (applying SOP 97-2 as

the relevant AICPA and GAAP standard).  "Probable" has the same definition as

used in FASB Statement No. 5, Accounting for Contingencies.  Aplt. App. 71.

That statement defines probable as: "The future event or events are likely to

occur."  Aplt. App. 71.  No GAAP pronouncement establishes a percentage for

"probable collectibility" under SOP 97-2.

In 2002, the SEC sent a letter inquiring about iMergent's revenue-

recognition practices.  Aplt. App. 85.  iMergent, after consulting with Grant

Thornton, responded that its collection rate for EPTAs was around 70%.  Aplt.

App. 86.  The SEC was satisfied with iMergent's response and took no further

action.  Aplt. App. 87.  The 70% figure, however, reflected the collection rate for

executory EPTAs—the collection rate for EPTAs upon completion of the entire

two-year term was projected to be 53%.  Aplt. App. 86.

In 2005, the SEC again inquired into iMergent's revenue-recognition

policy.  Aplt. App. 87.  In its response, iMergent indicated that collection rates

for EPTAs "exceed[ed] 50%" and were therefore "probably collectible" under

SOP 97-2.  Aplt. App. 89.  The SEC responded that in order to qualify as

"probable" under SOP 97-2, the collection rate must be "substantially higher than

50%."  Aplt. App. 89-90.  Shortly thereafter Grant Thornton withdrew its audit

opinions on iMergent's financial statements, Aplt. App. 90-91, and iMergent was

forced to alter its method of recognizing revenue and restate its financial

statements for fiscal years 2002, 2003, and 2004.  Aplt. App. 67-68, 91-92.  The

restatements drastically lowered revenues—revenues had been overstated by

372%, 279%, and 301% respectively—and earnings became losses for each of the

three years.  Aplt. App. 68; Aplt. Br. 18.  Not surprisingly, the stock price

declined.  Aplt. App. 93.

A company's management—not the auditor—is responsible for the

information contained in its financial statements and the propriety of its

underlying accounting policies, including compliance with GAAP.

See Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co., 454

F.3d 1168, 1174-75 (10th Cir. 2006).  However, Grant Thornton is responsible for

its audit reports, which contained its unqualified opinions on iMergent's financial

statements for fiscal years 2002, 2003, and 2004.  Aplt. App. 48-49.  According to

the complaint, Grant Thornton falsely represented that its audits had been

conducted in accordance with generally accepted auditing standards ("GAAS")

and wrongfully issued opinions that the financial statements fairly presented

iMergent's financial condition and results of operations in conformity with

GAAP.  Aplt. App. 50, 62, 64, 66-67; Aplt. Br. 3-4.  Plaintiffs contend that,

contrary to its unqualified opinions, Grant Thornton knew or was reckless in not

knowing that iMergent's revenue recognition policy violated GAAP.  More

specifically, Plaintiffs allege that Grant Thornton knew or was reckless in not

knowing that the 53% collection rate on EPTAs did not meet the "probable

collectibility" standard under SOP 97-2.[2]  Aplt. App. 67; Aplt. Br. 4.

A.    The Second Amended Complaint

In March 2005, Plaintiffs brought suit against Grant Thornton and iMergent.  Aplt. App. 26.  iMergent promptly settled, and in January 2009 Plaintiffs filed a Second Amended Consolidated Complaint ("SAC" or "complaint") with Grant Thornton as the lone defendant.  Aplt. App. 46.  The complaint alleged that Grant Thornton violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 by recklessly certifying that iMergent's financial statements complied with GAAP and that Grant Thornton's audits complied with Generally Accepted Auditing Standards ("GAAS").  Aplt. App. 47.  More particularly, Plaintiffs alleged that Grant Thornton recklessly concluded that iMergent's 53% collection rate on EPTAs satisfied SOP 97-2's "probable collectibility" standard.  Aplt. App. 73.  Defendants moved to dismiss the complaint with prejudice.

The district court granted Defendant's motion to dismiss, holding that the complaint failed to raise a "strong inference" that Grant Thornton acted with scienter, as is required by the Private Securities Litigation Reform Act of 1995 ("PSLRA").  See In re iMergent Sec. Litig., No. 05-cv-204, 2009 WL 3731965,

---

[2]  Grant Thornton argues that it applied SOP 97-2's requirement of "probable collectibility" on the basis of all sales including cash, credit card, and EPTA's, and that this practice complied with GAAP.  Aplee. Br. at 12, 14; but see Aplt. App. at 444 (asserting that a collection history of greater than 50% supports management's assertion of collectibility).

*7 (D. Utah Nov. 2, 2009).  Specifically, the court held that Plaintiffs'

"allegations fail to raise an inference of fraudulent intent that is cogent and as

compelling as the competing non-culpable inference that Grant Thornton was

merely negligent."  Id. at *11.

Plaintiffs timely appealed.  Aplt. App. 501.  They argue that the complaint

properly alleged Grant Thornton's reckless conduct, and that the district court

erroneously held them to an intentional fraud standard.  Aplt. Br. 28, 32.  We

review this issue *de novo*.  Alvarado v. KOB-TV, LLC, 493 F.3d 1210, 1215

(10th Cir. 2007).

B.    The Rule 60(b) Motion

After the district court dismissed the complaint, the Public Company

Accounting Oversight Board ("PCAOB")—a private, nonprofit corporation

created by the Sarbanes Oxley Act to regulate auditors of publicly traded

companies—imposed sanctions on two representatives of Grant Thornton for their

role in the iMergent audits.  Aplt. App. 510, 525.  Plaintiffs contend that the

PCAOB orders and documents referenced therein constitute evidence of Grant

Thornton's knowing or intentional misconduct.  Aplt. Br. 19.  In light of this

newly discovered evidence, Plaintiffs moved under Rule 60(b)(2) for relief from

the district court's dismissal with prejudice, seeking leave to amend the SAC to

incorporate the new evidence.  Aplt. App. 660.

The district court denied Plaintiffs' 60(b) motion on two grounds: (1) the

- 8 -

orders were merely summaries of the PCAOB's allegations to which the Grant

Thornton representatives had stipulated, not actual findings of fact; and (2) the

documents referenced by the PCAOB orders were not sufficiently important to

change the outcome of court's prior decision.  See In re iMergent Sec. Litig., No.

05-cv-204, 2010 WL 1331651, at *1 (D. Utah April 5, 2010).  Plaintiffs timely

appealed.

    We review for abuse of discretion a district court's denial of a Rule 60(b)

motion, keeping in mind that "Rule 60(b) relief is extraordinary and may only be

granted in exceptional circumstances."  See Zurich N. Am. v. Matrix Serv., Inc.,

426 F.3d 1281, 1289 (10th Cir. 2005) (internal quotation marks and citation

omitted).  A district court abuses its discretion when it commits legal error.

Lyons v. Jefferson Bank & Trust, 994 F.2d 716, 727 (10th Cir. 1993).


Discussion

A.    Dismissal of the Second Amended Complaint.

    Under the PSLRA, to bring a claim for violation of a securities law under

which plaintiffs "may recover money damages only on proof that the defendant

acted with a particular state of mind," the complaint must "state with particularity

facts giving rise to a strong inference that the defendant acted with the required

state of mind."  15 U.S.C. § 78u-4(b)(2) (emphasis added).

    In Tellabs, the Supreme Court explained the PSLRA's "strong inference"

- 9 -

requirement.  551 U.S. at 314.  The Court held that in order to give rise to a

strong inference of scienter,

> [i]t does not suffice that a reasonable factfinder plausibly could infer
> from the complaint's allegations the requisite state of mind.  Rather, .
> . . a court governed by [the PSLRA] must engage in a comparative
> evaluation; it must consider, not only the inferences urged by the
> plaintiff, . . . but also competing inferences rationally drawn from the
> facts alleged.

Id.  Thus, "[t]o qualify as 'strong' within the intendment of [the PSLRA], . . . an

inference of scienter must be more than merely plausible or reasonable—it must

be cogent and at least as compelling as any opposing inference of nonfraudulent

intent."  Id.

The PSLRA's heightened pleading standard applies to claims brought under

the Exchange Act of 1934 and Rule 10b-5.  See id. at 319.  In the Tenth Circuit,

"to state a claim under Section 10(b) of the [Exchange] Act and Rule 10b-5 a

plaintiff must allege: (1) a misleading statement or omission of a material fact;

(2) made in connection with the purchase or sale of securities; (3) with intent to

defraud or recklessness; (4) reliance; and (5) damages."  City of Philadelphia v.

Fleming Cos., 264 F.3d 1245, 1257-58 (10th Cir. 2001) (emphasis added)

(citation omitted); see also In re Williams Sec. Litig.-WCG Subclass, 558 F.3d

1130, 1136 (10th Cir. 2009) (listing substantially the same factors (citing

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 128 S. Ct. 761, 768 (2008)).

Recklessness is defined as "conduct that is an extreme departure from the

standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Fleming, 264 F.3d at 1258 (internal quotation marks and citations omitted).

Our sister-circuits have developed a recklessness standard specifically for Section 10(b) claims against outside auditors. See Pub. Employees' Ret. Ass'n of Colo. v. Deloitte & Touche LLP, 551 F.3d 305, 315 (4th Cir. 2009); In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 279 (3d Cir. 2006); PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 693-94 (6th Cir. 2004); DSAM Global Value Fund v. Altriss Software, Inc., 288 F.3d 385, 390 (9th Cir. 2002).  This standard is "especially stringent," requiring "a mental state so culpable that it approximates an actual intent to aid in the fraud being perpetrated by the audited company." PR Diamonds, 364 F.3d at 693 (internal quotation marks and citation omitted).  Under this standard, outside auditors act recklessly only when

> the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

Id., 364 F.3d at 693-94 (internal quotation marks omitted) (citing In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1426 (9th Cir. 1994) (quoting SEC v. Price Waterhouse, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)).

Combining the PSLRA's pleading standard with the Exchange Act's

scienter requirement, the Sixth Circuit has held that to properly allege a Section 10(b) violation against an auditor or accountant, "the complaint must identify specific, highly suspicious facts and circumstances available to the auditor at the time of the audit and allege that these facts were ignored, either deliberately or recklessly." Id. at 694 (internal quotation marks and citation omitted).

In this case, we need not decide whether to adopt an auditor-specific standard for recklessness under the Exchange Act. Under either standard, the complaint fails to meet the PSLRA's heightened pleading requirement.

In examining the complaint, we must take the factual allegations as true. See Tellabs, 551 U.S. at 322. However, we need not take as true the complaint's legal conclusions—most relevant here, Plaintiffs' repeated assertions that Grant Thornton acted recklessly. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). This is particularly true in this context because the PSLRA's heightened pleading standard requires the complaint to allege, with particularity, "facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2) (emphasis added). We must also view the entire complaint, and not just individual allegations in isolation. Tellabs, 551 U.S. at 322.

We have considered the complaint in its entirety. However, for purposes of our analysis it is helpful to identify those factual allegations most relevant to Grant Thornton's scienter. These allegations are:

- 12 -

- "Grant Thornton knew the respective collection rates for . . . all EPTA contracts at all relevant times" and "had continual access to and knowledge of iMergent's confidential . . . business information," Aplt. App. 50;

- At all relevant times, the "aggregate collection rate [for EPTAs] was just above 50%," Aplt. App. 50;

- SOP 97-2 defines "probable" with reference to FASB statement No. 5, which defines "probable" as "the future event or events are likely to occur," Aplt. App. 71;

- the FASB Staff Implementation Guide states that "probable is a higher level of likelihood than 'more likely than not,'"Aplt. App. 72;

- an accounting textbook suggests practitioners interpret "probable" "to be in the 78% range," Aplt. App. 72;

- "Grant Thornton had a lucrative relationship with iMergent which generated huge fees" and thus was "particularly motivated to appease the client because their remuneration was directly tied to the fees generated from iMergent," Aplt. App. 78;

- Grant Thornton knew of the 2002 SEC inquiry into iMergent's revenue-recognition practices, but did not reveal that the collection rate was only 53% or suggest revising the revenue recognition practices, but rather asserted to the SEC that the collection rate was 70%, Aplt. App. 87; and

- after the 2005 SEC letter informing iMergent that revenue collection had to be substantially higher than 50% in order to recognize the revenue up front, Grant Thornton withdrew its support for iMergent's revenue recognition practices instead of providing support for its prior position, Aplt. App. 89-90.

Even with these factual allegations, the complaint fails to give rise to a

cogent and compelling inference that Grant Thornton's actions constituted "an

extreme departure from the standards of ordinary care," Fleming, 264 F.3d at

- 13 -

1258 (internal quotation marks and citation omitted), or that "no reasonable

accountant would have made the same decisions if confronted with the same

facts."  <u>PR Diamonds</u>, 364 F.3d at 694 (internal quotation marks and citation

omitted).

As alleged in the complaint, Grant Thornton was fully aware of the facts

surrounding iMergent's revenue-recognition policy.  Aplt. App. 50.  Indeed, in its

public filings, iMergent explained that "approximately 47% of the gross amount

of all EPTA's that we enter into . . . will ultimately be determined to be

uncollectible."  Aplt. App. 159.  Grant Thornton correctly identified the

appropriate GAAP standard—SOP 97-2.  Aplt. App. 70-71.  The problem, as

alleged by the Plaintiffs, came not in conducting the audit itself, but rather in

applying the facts to the relevant GAAP—allegedly without any support.  In other

words, Plaintiffs allege that Grant Thornton was reckless in concluding that a

53% collection rate for EPTAs constituted "probable collectibility" under SOP

97-2 without obtaining any secondary sources to support their interpretation.

Aplt. Br. 28.

Plaintiffs identify two sources that indicate that the threshold for

"probable" under SOP 97-2 may be greater than 53%: a FASB Staff

Implementation Guide, and an auditing textbook.  Aplt. App. 72.

The FASB Staff Implementation Guide indicates that application of the

"probable" standard in the context of loan impairment requires judgment; it does

not mean virtually certain, but is a higher level of likelihood than "more likely than not."  Aplt. App. 72 (citing FASB Staff Implementation Guide, Q&A 114–Application of FASB Statements 5 and 114 to a Loan Portfolio).  However, as the district court correctly noted, the FASB Implementation Guide is low on the hierarchy of sources used to interpret GAAP.  See In re iMergent Secs. Litig., 2009 WL 3731965 at *9 (citing The Meaning of Present Fairly in Conformity with GAAP, AU § 411.18 (Am. Inst. of Certified Pub. Accountants 2008)).

The auditing textbook discusses the meaning of "probable" in the context of disclosing material loss contingencies.  See Wanda A. Wallace, Auditing 955-56 (3d ed. 1995).  It states, without citation, that "research suggests that a 78 percent range is encompassed in practice."  Id.  However, the textbook does not establish or even suggest that the 78% rate is the correct interpretation; to the contrary, it notes the controversy surrounding the definition of "probable" and offers no definitive conclusion.  Id. ("Despite debates that 'probable' should be redefined as 'more likely than not,' or 50/50, the FASB has retained the Exhibit 16-2 terminology and research suggests that a 78 percent range is encompassed in practice.  The General Accounting Office, a proponent of change, alleges that the language permits restrictive interpretations in the 95 percent range.  The controversy is likely to continue.").

Given the ambiguity and generality of these sources, we do not think that failure to incorporate them in the revenue-recognition context is evidence of

recklessness.  Moreover, both sources allude to the controversy over the meaning

of probable, and neither establishes that 78% is the correct threshold for

"probable collectibility" under SOP 97-2.  Finally, as the district court also noted,

the complaint does not allege that Grant Thornton knew about the relevant

authorities yet ignored them.  In re iMergent Sec. Litig., 2009 WL 3731965 at *9.

Plaintiffs plead no other facts establishing that Grant Thornton's conduct

was an extreme departure from ordinary care.  Instead, it appears that Plaintiffs

would have us conclude that failure to consult these two less-than-specific

sources constitutes recklessness sufficient to incur liability for fraud under the

Exchange Act—a conclusion that, without more, we are unwilling to make.

On appeal, Plaintiffs make two main arguments: that the complaint alleges

that Grant Thornton approved iMergent's practices "without finding *any* support,"

which constitutes "textbook recklessness," Aplt. Br. 28, 29; and that the district

court erroneously held them to an "intentional" scienter standard, instead of the

appropriate "recklessness" standard.  Aplt. Br. 32.  They also argue that the

magnitude of the restatement supports an inference of scienter, and that Grant

Thornton had a motive to engage in fraud, namely the desire to please iMergent

and continue to receive large audit fees.  Aplt. Br. 34; 37.  These arguments are

unavailing.

First, it is simply inaccurate to state that Grant Thornton did not have any

support for its approval of the practices.  SOP 97-2 itself does not define the

- 16 -

phrase "probable collectibility."  Aplt. App. 49, 57.  Instead, it references FASB

Statement 5, which defines "probable" as "likely to occur"—a definition that does

not, on its face, rule out a "more likely than not" standard.  Aplt. App. 71.

Thus, while it is true that, according to the complaint, Grant Thornton did

not produce any secondary sources to support its interpretation, SOP 97-2 itself

and FASB Statement 5 provide some support.  Although Grant Thornton's

interpretation of the rule may have been incorrect or even negligent, the

complaint does not establish that Grant Thornton's conduct was an "extreme

departure from the standards of ordinary care," Fleming, 264 F.3d at 1258, or that

"no reasonable accountant would have made the same decision[] if confronted

with the same facts." PR Diamonds, 364 F.3d at 694-95.

Second, the district court did not improperly hold Plaintiffs to an

intentional standard.  To the contrary, the district court devoted several pages of

its opinion to developing the proper recklessness standard.  See In re iMergent

Sec. Litig., 2009 WL 3731965 at *6-*7.  Plaintiffs identify several statements

that, they claim, are predicated on application of an intentional fraud standard.

Aplt. Br. 33-37.  That is not the case.  The district court's conclusions merely

recognize—correctly—that recklessness under section 10(b) is a particularly high

standard.  See In re iMergent Sec. Litig., 2009 WL 3731965 at *6-*7.  Indeed, it

is the Plaintiffs who are in error, as they appear to predicate their arguments on a

standard akin to negligence or gross negligence—which is below the high

threshold for liability under Section 10(b) of the Exchange Act.  See Fleming, 264

F.3d at 1258 ("Simple negligence . . . does not satisfy the scienter requirement."

(citations omitted)); accord South Cherry St., LLC v. Hennessee Grp. LLC, 573

F.3d 98, 109 (2d Cir. 2009) (defining recklessness under the Exchange Act as "a

state of mind approximating actual intent, and not merely a heightened form of

negligence" (internal quotation marks and citation omitted)); PR Diamonds, 364

F.3d at 681-82 ("Recklessness is a mental state apart from negligence and akin to

conscious disregard." (internal quotation marks and citations omitted)); In re

Comshare Inc. Sec. Litig, 183 F.3d 542, 550 n.7 (6th Cir. 1999) ("[F]ederal

appellate courts have long held the view that, for the purpose of securities fraud,

recklessness that is far from negligence and closer to a lesser form of intent

constitutes scienter." (internal quotation marks and citation omitted)).

     Plaintiffs argue that the magnitude of the restatement supports an inference

of scienter.  Aplt. Br. 34.  However, we agree with the district court that Plaintiffs

failed to adequately explain the connection between the restatement and scienter.

See In re iMergent Sec. Litig., 2009 WL 3731965 at *10.  In this case, the

allegedly reckless action is Grant Thornton's failure to provide support for its

approval of iMergent's revenue-recognition policy.  The magnitude of the

restatement has nothing to do with Grant Thornton's scienter in applying SOP 97-

2—presumably, the restatement would have been equally large had Grant

Thornton acted in good faith, negligently, recklessly, or, for that matter,

- 18 -

intentionally.  Further, even if the magnitude of the restatement is one factor

supporting a finding of scienter—as Plaintiffs argue, <u>see</u> Aplt. Br. 34—the

complaint as a whole still fails to raise a cogent and compelling inference that

Grant Thornton acted with scienter.

 Plaintiffs also argue that Grant Thornton had a motive to engage in

fraudulent or reckless conduct: to please the client and continue to receive

auditing fees.  Aplt. Br. 37.  While this may be true, that motive is present in

<u>every</u> relationship between an independent auditor and a company.  Plaintiffs do

not allege facts tending to show that Grant Thornton's motive in this case was

atypical or linked to the revenue recognition policy.  Thus, Grant Thornton's

motive in this case does not support an inference of scienter.  <u>Accord</u> <u>La. Sch.</u>

<u>Employees' Ret. Sys. v. Ernst & Young, LLP</u>, 622 F.3d 471, 484 (6th Cir. 2010)

("Allegations that the auditor earned and wished to continue earning fees from a

client do not raise an inference that the auditor acted with the requisite scienter."

(internal quotation marks and citation omitted)); <u>In re Stone & Webster, Inc., Sec.</u>

<u>Litig.</u>, 414 F.3d 187, 215 (1st Cir. 2005) ("[A]bsent truly extraordinary

circumstances, an auditor's motivation to continue a profitable business

relationship is not sufficient by itself to support a strong inference of scienter.").

 Finally, the fact that iMergent publically disclosed its expected collection

rate on EPTAs seriously undercuts any inference that Grant Thornton acted with

the requisite scienter.  The 10Ks from 2003 and 2004 clearly indicate iMergent's

revenue-recognition policy.  <u>See</u> Aplt. 158-59, 468-69.  These disclosures are

more consistent with the inference that Grant Thornton made an erroneous and

perhaps negligent interpretation of an ambiguous GAAP than with the inference

that Grant Thornton's conduct was "an extreme departure from the standards of

ordinary care" that "present[ed] a danger of misleading buyers or sellers."

<u>Fleming</u>, 264 F.3d at 1258 (internal quotation marks and citation omitted).

It is true that the SAC may adequately plead a GAAP violation.  However,

it is well-established that "[c]laims of accounting irregularities or violations of

[GAAP] support a claim of scienter only when coupled with evidence that the

violations or irregularities are the result of the defendant's fraudulent intent to

mislead investors."  <u>Pirraglia v. Novell, Inc.</u>, 339 F.3d 1182, 1191 (10th Cir.

2003) (internal quotation marks and citations omitted); <u>see also</u> <u>Thompson v.

RelationServe Media, Inc.</u>, 610 F.3d 628, 688 (11th Cir. 2010) (Tjoflat, J.,

concurring in part and dissenting in part) ("Accounting irregularities, even

violations of GAAP in Sarbanes-Oxley certified accounting statements, cannot

support an inference of scienter unless the officer certifying the statement was

severely reckless." (internal quotation marks and citations omitted)); <u>ECA Local

134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co</u>., 553 F.3d 187,

200 (2d Cir. 2009) ("Allegations of GAAP violations or accounting irregularities,

standing alone, are insufficient to state a securities fraud claims.  Only where

such allegations are coupled with evidence of corresponding fraudulent intent

might they be sufficient." (internal quotation marks and citation omitted)). Plaintiffs' failure to adequately allege scienter, then, is fatal to their claim notwithstanding the alleged GAAP violation.

In sum, the complaint fails to raise a strong inference that Grant Thornton acted with scienter in expressing an unqualified opinion on iMergent's financial statements. Specifically, the "plausible nonculpable" inference that Grant Thornton acted negligently is far more "cogent and compelling" than the inference that it acted sufficiently reckless to incur liability under Section 10(b) of the Exchange Act. See Tellabs, 551 U.S. at 324. Therefore, the district court correctly dismissed the complaint under the PSLRA.

B.   Denial of the Rule 60(b) Motion.

Rule 60(b)(2) permits courts to grant relief from a prior judgment if the moving party presents "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b)(2). Relief under Rule 60(b) is warranted only in "exceptional circumstances," and "[a] plaintiff must overcome a higher hurdle to obtain relief from a post-judgment motion than on direct appeal from a judgment." LaFleur v. Teen Help, 342 F.3d 1145, 1153 (10th Cir. 2003) (internal quotation marks and citations omitted).

To be eligible for relief under Rule 60(b)(2), the moving party must show: "(1) the evidence was newly discovered since the trial; (2) the moving party was

diligent in discovering the new evidence; (3) the newly discovered evidence [was]

not merely cumulative or impeaching; (4) the newly discovered evidence is

material; and (5) that a new trial with the newly discovered evidence would

probably produce a different result." Zurich N. Am. v. Matrix Serv., Inc., 426

F.3d 1281, 1290 (10th Cir. 2005) (internal quotation marks and citation omitted).

Of course, in this case the Plaintiffs sought relief from an order dismissing the

case, not from the result of a trial—but the required showing under Rule 60(b)(2)

remains the same. See Goldstein v. MCI Worldcom, 340 F.3d 238, 257-58 (5th

Cir. 2003) (applying Rule 60(b)(2)'s newly discovered evidence standard to a

motion for relief from the district court's dismissal of the suit).

In this case, the newly discovered evidence consists of two orders released

by the PCAOB. Aplt. App. 505. Those orders contain allegations made by the

PCAOB relating to Grant Thornton's audit of iMergent's 2004 financial

statements. Aplt. App. 510; 525. The respondents in the PCAOB proceedings

were Jay Westergard, a Grant Thornton partner, and Jennifer Nakao, both

Certified Public Accounts ("CPA") employed by Grant Thornton. Aplt. App. 511,

526. The respondents stipulated to the allegations and did not contest the

resulting sanctions. Aplt. App. 510, 525. In essence, the PCAOB orders allege

that the respondents ignored data tending to show that iMergent's collection rates

for EPTA contracts were below 50%—and thus were not "probable"—and that

they otherwise failed to obtain reasonable assurances that iMergent's

- 22 -

representations of its historical collection rate were accurate.  Aplt. App. 512-23;

527-37.  The orders referenced several documents, including emails between

Grant Thornton employees and spreadsheets and other documents created by

iMergent.  Aplt. App. 517, 518-19; 532, 534.

The district court denied Plaintiffs' motion, holding that the PCAOB orders

were of dubious weight because they were merely summaries of the PCAOB's

allegations, not proven facts, In re iMergent Sec. Ligit., 2010 WL 1331651 at *1,

and because the orders were "not of such importance that they are likely to alter

the outcome of the court's [prior order]."  Id.

On appeal, Plaintiffs argue that the PCAOB orders give them a sufficient

basis to allege Grant Thornton's scienter.  The newly discovered evidence, they

argue, shows that Grant Thornton was reckless because Grant Thornton approved

iMergent's revenue-recognition practices despite being aware of information that

the EPTA collection rate was below 50%.  Aplt. Br. 41.  They argue that Grant

Thornton knowingly or recklessly ignored such information, and knowingly or

recklessly failed to obtain reasonable assurances that iMergent's data on historical

collection rates was correct.  Aplt. Br. 41-43.  Additionally, Plaintiffs argue that

they could not have discovered the PCAOB orders before the district court

dismissed the case because the PCAOB proceedings were closed, and because the

PSLRA stays discovery until after a motion to dismiss has been denied.  Aplt. Br.

49.

At the outset Plaintiffs argue that we should review the district court's order de novo for conclusions of law.  Aplt. Br. 25-26.  This is correct, but only in the context of our overall review for abuse of discretion: "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law."  Lyons, 994 F.2d at 727 (internal quotation marks and citation omitted).  We perceive no abuse of discretion here, on the basis of an erroneous legal conclusion or otherwise.

Plaintiffs' primary theory—as laid out in the SAC—is that Grant Thornton was reckless in approving iMergent's financial statements without any support for its position that a 53% collection rate constituted "probable collectibility" under SOP 97-2.  Yet, the PCAOB allegations and the documents cited therein contain no information related to Grant Thornton's interpretation of SOP 97-2.  Specifically, they do not identify readily available, unambiguous, applicable sources that foreclosed Grant Thornton's interpretation.  Rather, the PCAOB orders directly contradict the SAC: the SAC alleges that Grant Thornton knew the collection rate for EPTAs, Aplt. App. 50; but the PCAOB sanctions are predicated on the notion that Grant Thornton did not know the actual collection rates.  Aplt. App. 512, 519, 533.

As Plaintiffs have pointed out, the PCAOB orders could possibly support some of their allegations against Grant Thornton.  Aplt. Br. 42-43.  However, a suit predicated on the PCAOB orders would be markedly different than the suit

set forth in the SAC.  A complaint based on the PCAOB orders would allege that

Grant Thornton acted recklessly in failing to properly <u>investigate</u> iMergent's

revenue-recognition practices—as opposed to the SAC, which alleged that Grant

Thornton knew all the relevant facts yet acted recklessly in <u>applying</u> SOP 97-2 to

those facts.  In other words, the PCAOB allegations would possibly support a suit

based on Grant Thornton's alleged failure to properly <u>conduct</u> an audit, not a suit

based on whether Grant Thornton failed to properly <u>apply</u> a GAAP standard to an

audit.  Plaintiffs admit as much in their reply brief.  Aplt. Rep. Br. 20 ("[T]he

Complaint did not plead *any* evidence of GT's *knowledge* of improper accounting

at iMergent, but was based instead on GT's reckless failure to have obtained any

support for application of the 'more likely than not' standard of 'probable'

collection.  The PCAOB order, on the other hand, details information not alleged

in the Complaint, including 'red flags' knowingly disregarded by GT . . . .").

     The district court correctly noted that the PCAOB allegations contained no

evidence that would remedy the previously identified deficiencies in the SAC.

<u>See</u> <u>In re iMergent Sec. Litig.</u>, 2010 WL 1331651 at *1.  This conclusion is

predicated on a proper view of the law and the facts of the case.

     Further, Plaintiffs failed to establish that they met the requirements of Rule

60(b)(2).  First, Plaintiffs never adequately explained why they could not have

discovered the evidence underlying the PCAOB orders, had they practiced due

diligence.  Indeed, the record supports the conclusion that Plaintiffs could have

accessed the information.  In the SAC, the Plaintiffs assert that iMergent provided

them with "non-public documents . . . as well as interviews with present and

former iMergent officers and directors."  Aplt. App. 46.  This information

provided the basis for the SAC.  Aplt. App. 46-47.  In fact, iMergent's agreement

to cooperate in the suit was a major factor in Plaintiffs' decision to settle its

claims against iMergent and its directors.  See Aplee. Supp. App. 101 ("[T]he

Settling Defendants will provide [P]laintiffs evidence . . . with documentation and

other evidence in support of [Plaintiffs'] claim . . . ." (quoting Doc. No. 141,

Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Leave to File a

Second Amended Complaint as to the Sole Remaining Defendant Grant Thornton

LLP)).

    Plaintiffs did not explain to the district court, see Aplt. App. 505-06, and

do not adequately explain to us, how and why they were unable to obtain the

information that formed the basis of the PCAOB allegations.  Given iMergent's

extensive cooperation throughout the litigation, it appears that Plaintiffs could

have accessed the information contained in the PCAOB orders, had they exercised

due diligence.  In any event, it is Plaintiffs' burden to establish that they were

entitled to relief under Rule 60(b), and the district court could reasonably find

that they did not establish that the evidence was unavailable to them.

    Second, Plaintiffs have not established that they were indeed diligent in

pursuing the information contained in the PCAOB orders.  Actual diligence is one

of the requirements for relief under Rule 60(b)(2).  Zurich N. Am., 426 F.3d at

1290; see also Miller v. Baker Implement Co., 439 F.3d 407, 414 (8th Cir. 2006)

(to succeed on a Rule 60(b)(2) motion, the moving party must show "that the

movant exercised diligence to obtain the evidence before entry of the order");

United States v. Fulcher, 250 F.3d 244, 249 (4th Cir. 2001) (noting that to

succeed on a Rule 60(b)(2) motion, the moving party must allege facts "from

which the court may infer diligence on the part of the movant" (internal quotation

marks and citation omitted)).  In their motion to the district court Plaintiffs

merely offered the bare-bones assertion that "Plaintiffs were justifiably ignorant

of the evidence despite due diligence."  Aplt. App. 506.  Likewise on appeal.

See Aplt. Br. 48-50.  Yet Plaintiffs themselves allege that they had access to

iMergent's non-public documents.  Aplt. App. 46-47.  In exercising its discretion,

the district court was not required to credit Plaintiffs' mere assertion of diligence,

especially given the circumstances here, where Plaintiffs themselves allege

extensive cooperation by iMergent.

Accordingly, the district court did not abuse its discretion in denying

Plaintiffs' Rule 60(b) motion.

AFFIRMED.

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
## OFFICE OF THE CLERK

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

| | | |
|---|---|---|
| Elisabeth A. Shumaker<br>Clerk of Court | January 20, 2011 | Douglas E. Cressler<br>Chief Deputy Clerk |

Mr. Ira M. Press
Ms. Sarah G. Lopez
Kirby McInerney, LLP
16th Floor
825 Third Avenue
New York, NY 10022-0000

Mr. Richard D. Burbidge
Mr. Jefferson Wright Gross
Burbidge & Mitchell
215 S ST ST STE 920
Salt Lake City, UT 84111-0000

Mr. Jonathan Gardner
Ms. Carol C. Villegas
Labaton Sucharow LLP
140 Broadway
New York, NY 10005

**RE:     09-4222 and 10-4074, Firestone, et al v. Imergent**
        Dist/Ag docket: 2:05-CV-00204-DB

Dear Counsel:

Attached is a copy of the opinion of the court in the captioned cases. Judgment was
entered today.

Please contact this office if you have questions.

Sincerely,

Elisabeth A. Shumaker
Clerk of the Court

cc:     Gary F. Bendinger
        Christopher Sullivan

EAS/at